# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Negron*, 2012 IL App (1st) 101194

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JASON NEGRON, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1-10-1194 |
| Filed<br>Rehearing denied<br>Modified upon denial<br>of rehearing | October 4, 2012<br>January 28, 2013<br><br>January 31, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In a prosecution for residential burglary, a sufficient foundation was laid for the admission of a fingerprint expert's testimony that the prints recovered from the scene matched defendant's palm prints and the testimony of a DNA expert was properly admitted pursuant to *Williams*. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-CR-25839; the Hon. Domenica Stephenson, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Jessica D. Pamon, all of State Appellate Defender's Office, of Chicago, for appellant. |
| | |
| | Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Amy Watroba Kern, and Heather Fahrenkrog, Assistant State's Attorneys, of counsel), for the People. |
| | |
| Panel | JUSTICE PUCINSKI delivered the judgment of the court, with opinion. Presiding Justice Lavin concurred in the judgment and opinion. Justice Epstein specially concurred, with opinion. |

**OPINION**

¶ 1        In an appeal from a judgment entered on a conviction for residential burglary, the defendant argues the trial court erroneously allowed the testimony of a fingerprint examiner where he did not testify to a specific number of points of comparison and therefore lacked foundation for the admission of his opinion. The defendant also argues that the trial court erred in allowing an expert from Cellmark to testify to a DNA analysis and report that were not performed or prepared by her. We hold the trial court properly admitted the testimony of the fingerprint expert where he laid a sufficient foundation that the prints recovered from the crime scene matched defendant's palm prints, in that he detailed the analysis process he specifically used in this case and was able to determine there was a match. There is no requirement for a set number of minimum points of similarity in order for fingerprint expert testimony to be admissible. We also hold the trial court did not err in allowing the expert from Cellmark to testify regarding a report analyzing defendant's DNA, even though the expert was not the individual who performed the analysis. The DNA expert was properly allowed to testify regarding the results contained in Cellmark's DNA analysis report and notes pursuant to the United States Supreme Court's holding in *Williams v. Illinois*, 567 U.S. ___, 132 S. Ct. 2221 (2012) (plurality op.). The report is not testimonial in nature and therefore does not violate the confrontation clause of the sixth amendment.

¶ 2                            I. BACKGROUND
¶ 3        Defendant raises two arguments as the basis for his appeal and request for reversal: (1) the testimony of the fingerprint expert did not establish a sufficient foundation for his expert opinion that the fingerprints in this case matched defendant; and (2) the admission of Gina Pineda's testimony regarding the DNA analysis was error because she was not the person who performed the analysis and thus defendant's sixth amendment right of confrontation was violated. We address each argument in turn after our summary of the proceedings below.

¶ 4                                    A. Pretrial Proceedings

¶ 5        Prior to trial, defendant filed a motion to exclude the testimony of the State's Cellmark expert witness and the DNA evidence. Defendant argued that the DNA report of Gina Pineda, who did not actually perform the DNA test, was testimonial evidence that should not be admitted because it would violate the holding of *Crawford v. Washington*, 541 U.S. 36 (2004). Specifically, defendant argued that Pineda should be prohibited from giving her expert opinion regarding the results of the DNA analysis because she was not one of the actual analysts who performed the test and that the State was therefore incapable of laying the foundation for the DNA report. The court denied the motion, finding that it was bound to follow *People v. Johnson*, 389 Ill. App. 3d 618 (2009), and *People v. Williams*, 385 Ill. App. 3d 359 (2008), which held that such expert testimony was admissible.

¶ 6        Defendant also filed a motion *in limine* to bar the opinion testimony of the fingerprint examiner, arguing that there was no foundation for his opinion because no notes were tendered in pretrial discovery concerning the examination of the prints and the examiner gave no basis in his report for his opinion that the latent prints recovered from the scene matched defendant's prints. The court found that defendant's motion was premature but granted it anyway, stating that in order for the fingerprint examiner to be allowed to render his opinion at trial, the State would have to lay the proper foundation for his testimony. The court told defense counsel that she could renew the objection during the fingerprint examiner's testimony and the court would address the issue at that time. The case proceeded to a jury trial.


¶ 7                                            B. Trial

¶ 8        At trial, the victim of the burglary, Santiago Uriarte, testified that he lived at 6201 W. Devon Avenue with his wife, mother-in-law, and two children. The house had an enclosed back porch with an outer storm door, which always remained unlocked, and an inner rear door leading into the house which the family would lock. The morning of March 17, 2006, Uriarte dropped his children off at school and then went to meet with a client for a few hours. His mother-in-law normally left for work at 8 a.m., and his wife normally left for work at 8:45 a.m. When Uriarte returned home around 1:30 p.m., he opened the storm door to the back porch and saw that the glass on the inner door was broken and the door was open. Uriarte saw that the kitchen was in disarray and ran back outside to call 911. An officer arrived a few minutes later and went inside the house. The officer then came out and took Uriarte back inside the house. Everything was thrown to the floor in the kitchen, his mattress was cut, all of his electronics and laptops were missing, and checkbooks, jewelry, and passports were missing as well. Items were missing from all over the house. An evidence technician arrived and took fingerprints.

¶ 9        Later that same night while he was cleaning up, Uriarte found a piece of what appeared to be a bloodstained tissue underneath his bed. Uriarte put the tissue in a sealed bag. Uriarte testified that the tissue could have been there prior to the burglary because his cleaning lady normally cleans under the beds and had been to the house the day before the burglary. The next day, March 18, Uriarte called the police and told them about the tissue. The police came

and picked up the sealed tissue from Uriarte on March 20. Uriarte testified that he did not know defendant and did not give him permission to enter and take anything from his home.

¶ 10      Evidence technician Tony Shannon testified that he processed Uriarte's house on the day of the burglary. The glass on the inner rear door of the house was broken. Shannon testified that he recovered three latent print impressions from the exterior of the glass on the inner rear door. Shannon observed that there was no damage to the outer storm door to the back porch, only to the inner rear door. Shannon did not observe any blood anywhere in the home and did not notice any bloody tissue. No pictures were taken because, typically, unless an offender is already in custody or there is something unusual about the crime scene, pictures are not routinely taken in a burglary case. Shannon inventoried the prints and prepared a report.

¶ 11      Evidence technician John Klusman testified that he recovered a red-stained tissue from Uriarte's house and inventoried it. The tissue was then sent to the Illinois State Police for testing.

¶ 12      Pauline Gordon, a forensic scientist with the Illinois State Police, was found qualified as an expert in forensic biology and DNA analysis and testified at trial. Gordon testified that she received the red-stained tissue and performed the Kastle-Meyer test for the presence of blood, and the test confirmed that there was blood on the tissue. Gordon then packaged the sample and sent it to Cellmark for DNA testing of the blood.

¶ 13      Gina Pineda, former director and technical leader at Cellmark, was found to be qualified as an expert in DNA analysis and testified in the case. Pineda testified that Cellmark was asked to generate a DNA profile for the bloodstain on the tissue received from the Illinois State Police. Cellmark generated a DNA profile that could then be used for comparison to a known sample. Pineda explained the four-step polymerase chain reaction (PCR) testing procedure at Cellmark for DNA analysis: extraction (separating the DNA from any other substance in the sample); quantitation (determining how much DNA there is); amplification; and obtaining a profile. The final resulting DNA profile is comprised of 13 genetic markers, and the PCR method is widely accepted in the scientific community and is the method used in all labs for DNA analyzing. Once there are 13 markers, the data are viewed using special software and there must be a minimum of relative fluorescent units (RFUs) in order to read the results. The cutoff of RFUs at Cellmark is 100. There can be points that come in below 100 RFUs, and if there are multiple points below 100, it could mean that there is DNA from a second individual. However, in defendant's case, there were no peaks in the data below 100 RFUs, meaning the DNA sample from the blood on the tissue was from only one individual.

¶ 14      There are multiple analysts involved in the different steps of generating a DNA profile. Pineda testified that the PCR method is widely accepted in the scientific community and is the method used in all labs for DNA testing. Pineda herself did not conduct the testing performed in this case. However, she testified that she performed the technical review of the documentation that was generated during the analysis and also reviewed the final data of the samples. Without objection, Pineda referred to the report and notes in the case file that was prepared in 2007, but the report was not admitted into evidence. Pineda did not review the report and case file notes back in 2007. However, Pineda testified that she reviewed the

analysis of the samples and the final data prior to her testimony at trial. Pineda also testified that she has testified many times in other cases in the same capacity as a technical reviewer. Pineda also explained the quality control system at Cellmark to prevent contamination and mistakes. Each DNA sample is securely preserved, and when an analyst is done performing analysis, the sample is returned to the evidence technician and is maintained in the secure area of Cellmark's laboratory with limited access. After testing the sample, Cellmark packaged it and returned it to the Illinois State Police.

¶ 15    After Pineda's testimony, the defense moved to strike her testimony based on lack of foundation, arguing that this was a different objection than the *Crawford* confrontation rights objection that was raised in the pretrial motion. The trial court overruled the objection, finding that there was a sufficient foundation for Pineda's expert testimony.

¶ 16    Karri Broaddus, a forensic scientist for the Illinois State Police crime lab, testified that she reviewed the DNA profile generated by Cellmark and entered the profile into a DNA database to search the database for a match. There was a match for a person named "Carlos Frontera," so Broaddus notified the Chicago police department and then requested that a buccal swab be taken from this individual and tested.

¶ 17    Detective Patrick Mullane testified that he received the result from the Illinois State Police crime lab listing a suspect who he verified in his investigation was defendant.[1] Mullane testified he was able, through his investigation, to locate defendant and place him under arrest for the burglary. Mullane identified defendant as the suspect in open court. Pauline Gordon from the Illinois State Police then performed a DNA analysis on defendant's buccal swab and compared it to the DNA profile from Cellmark and the two profiles matched.

¶ 18    After Mullane received the results of the DNA database search, he also submitted a request for a fingerprint comparison of the three latent prints taken from the rear door of Uriarte's home. On July 30, 2007, William Kovacs, an expert in fingerprint identification and comparison, received the request to process the latent prints. He compared the latent prints to defendant's left and right palm prints and determined that two of the latent prints matched defendant.

¶ 19    At trial, Kovacs testified as an expert witness. Kovacs was a latent fingerprint examiner for 25 years and over his career had examined over 1,000 pieces of evidence for the presence of fingerprints and had compared a known print to a latent print thousands of times. Kovacs had also testified in court as an expert over a hundred times. Kovacs explained that a latent fingerprint is an impression enhanced with fingerprint powder and then transferred to a sticky fingerprint lift. Kovacs explained that what creates unique fingerprints is the "friction ridge skin," which is on the underside of one's hands and includes the palms and fingers. No two people share the same fingerprint. On July 30, 2007, the latent fingerprint unit received the

---

[1]Although neither the State nor defendant clarified at trial how Mullane concluded defendant was the correct suspect when the Illinois State Police lab report indicated the suspect was named "Carlos Frontera," defendant's arrest report indicates that "Carlos Frontera" was one of defendant's aliases.

fingerprint evidence in defendant's case. Kovacs first analyzed the evidence for suitability purposes and found the prints suitable for comparison.

¶ 20    On August 21, 2007, Kovacs retrieved the evidence and began his comparison process. Kovacs explained the process of fingerprint comparison, which is comprised of four stages: analysis; comparison; evaluation; and verification, or "ACEV." Kovacs first again determined that all three latent prints from the palm area of a hand that were lifted from the rear door of the Uriarte home were suitable for comparison and had evidentiary value. Next, Kovacs performed a comparison of the friction ridge design visible on the latent prints to the fingerprint card standard from defendant that he was asked to compare. Using a "Henry" magnifying glass, with one glass on the evidence and one glass on the known print standard, Kovacs searched for areas where the friction ridge design on the fingerprints matched or did not match.

¶ 21    Defense counsel objected when the State asked Kovacs to render his expert opinion regarding the results of the fingerprint comparison. The trial court overruled the objection. Kovacs testified that he found unique areas that matched and that there was an identification of the latent print "A" to defendant's right palm standard and the latent print "B" to defendant's left palm standard. Kovacs then testified that in his expert opinion, two of the latent prints matched defendant's palm prints. Kovacs testified that "using the quantitative, qualitative ACEV examination process it seemed to have sufficient number of points of sufficient clarity and quantity to individualize on those two identifications." The third latent print could not be linked to defendant. Kovacs' opinion was independently reviewed and verified by latent fingerprint examiner Fred Scott. Kovacs also later confirmed his opinion with a new set of palm print standards from defendant. Kovacs repeated the entire ACEV process with the new set of confirmatory fingerprints. Kovacs again reidentified the right palm print "A" and left palm print "B" from the rear glass door of the Uriarte home as being defendant's palm prints.

¶ 22    On cross-examination, Kovacs explained that "first level detail" in fingerprint comparison is the overall shape of the finger and different patterns of loops, whorls and arches. Identifications are made with level-two detail, in which comparisons of minutia are made. Kovacs explained the minutia in fingerprint comparison in level two detail. Where a fingerprint ridge stops is an "ending ridge," which is one of the minutia. Another fingerprint or palm print characteristic is where a ridge splits, which is called a bifurcation. Yet another characteristic is where a ridge never developed and there is a single pore hole, referred to as a dot. Kovacs does not take notes in describing similarities in the minutia he observes.

¶ 23    In explaining the basis of his opinion on cross-examination, Kovacs explained that he does not have a threshold level of points of similarity in fingerprints that are required to make an identification and that he did not count the areas of similarity when he was making the identification in defendant's case. Kovacs further explained that "there was a time where certain jurisdictions did have a threshold," but the International Association for Identification, the organization that issues fingerprint examiner certification, no longer recognizes jurisdictions which require a certain number of points for fingerprint comparison. Kovacs also testified that he did not take notes describing his observations when he compared the prints. However, Kovacs testified that he also took an additional set of

fingerprints from defendant and confirmed his findings with the new set of prints. Kovacs' results were then verified independently by another latent print examiner.

¶ 24    The defense's motion for a directed verdict was denied. The State rested, and the defense rested. The jury found defendant guilty of residential burglary.

¶ 25                                C. Posttrial Proceedings

¶ 26    Defendant's trial counsel filed a motion for a new trial arguing that the trial court erred in allowing the expert testimony of Pineda regarding the DNA evidence and the expert testimony of Kovacs regarding the fingerprint evidence for the same reasons in the pretrial motions *in limine*. The trial court denied the motion, finding that its evidentiary rulings were proper and if there were any errors they were harmless.

¶ 27    Defendant also filed a written *pro se* motion for a new trial, arguing that his assistant public defenders were ineffective. A hearing was held and the court found defendant's claims were without merit and denied the motion. Subsequently, defendant moved to waive his right to counsel and proceed *pro se*. The court informed defendant that he would not receive any special treatment if he proceeded *pro se* and admonished him of the possible sentence of imprisonment he faced. Defendant informed the court that he understood and told the court that he had a General Educational Development degree (GED) and that he had spent significant time working in law libraries in various correctional institutions where he was previously incarcerated. The court found that defendant's waiver was knowing and voluntary and accepted his waiver of counsel.

¶ 28    Defendant also filed a motion for substitution of judge, which was heard by Judge Biebel. Defendant alleged that Judge Stephenson (the trial judge) was biased against him and laughed at and ridiculed him. Judge Stephenson voluntarily recused herself and the case was returned to Judge Timothy Joyce, who was the judge who presided over defendant's pretrial proceedings. Defendant argued his *pro se* motion for a new trial before Judge Joyce. Defendant repeated the arguments made in his counsel's posttrial motion and orally argued his own amendments to their motion. The court denied the motion.

¶ 29    On November 12, 2009, the court granted leave for a private attorney, Sandra Ramos, to file an appearance on behalf of defendant and leave to file a motion for judgment notwithstanding the verdict or, in the alternative, for a new trial and in arrest of judgment. The motion repeated the arguments in his previous counsel's posttrial motion, and also argued defendant's trial counsel's ineffectiveness. After a hearing, the court further allowed defendant to argue additional issues, but defendant merely repeated arguments that had already been raised. The court denied the motion for a new trial and proceeded to sentencing.

¶ 30    Due to his background of prior convictions, defendant was required to be sentenced as a Class X offender and was sentenced to a term of 25 years in prison. Defendant's counsel filed a motion to reconsider the sentence. Defendant also filed a *pro se* "Post-Judgment/Post-Sentencing Motion." Although defendant was represented by counsel, the court stated it would consider his *pro se* motion also. At the hearing, the court found that defendant's sentence was excessive and reduced his sentence to 17 years. Defendant appealed.

¶ 31                                II. ANALYSIS

¶ 32                        A. Fingerprint Evidence Foundation

¶ 33     First, defendant argues that the testimony of the fingerprint expert, William Kovacs, lacked sufficient foundation and therefore was inadmissible. The State argues that defendant forfeited the issue by not raising a *timely* objection during trial, not requesting a sidebar, not making a specific objection, and proceeding to extensively cross-examine Kovacs when the objection was overruled. However, the record reveals defendant did raise an objection at trial prior to the expert providing his opinion and also renewed the objection in his motion for a new trial, thereby satisfying the rule regarding preservation of error. See *People v. Enoch*, 122 Ill. 2d 176, 187 (1988) (holding that to preserve a trial error, the defendant must make a timely trial objection and renew that objection in a written posttrial motion). Therefore, we address defendant's argument regarding the foundation of the fingerprint expert's testimony.

¶ 34     In the area of fingerprint evidence, expert testimony based on scientific knowledge is necessary. *People v. Hunley*, 313 Ill. App. 3d 16, 29 (2000). In order for expert testimony to be admissible, the proponent must lay an adequate foundation establishing that the information upon which the expert based his opinion is reliable. *People v. Safford*, 392 Ill. App. 3d 212, 221 (2009), *appeal denied*, 233 Ill. 2d 590 (2009). When a fingerprint expert provides testimony, he must lay an adequate foundation explaining how he reached his conclusion. *Safford*, 392 Ill. App. 3d at 223. Whether the foundational requirements have been met is a question of law that we review *de novo*. *Id*. at 221.

¶ 35     Defendant contends that the testimony of Kovacs in this case is deficient because he "did not document the features that led him to his conclusion and did not count the areas of similarity between the latent prints and [defendant's prints]." Defendant asserts that "[t]his type of testimony where no explanation is provided for how the expert reached his or her opinion is inadmissible because it deprives the defendant of any means to challenge the 'conclusion' of the expert," citing *Safford*, 392 Ill. App. 3d at 227.

¶ 36     Defendant argues the instant case is similar to *Safford*, where the court found the fingerprint expert's testimony regarding the basis for his opinion insufficient and reversed and remanded for a new trial. In *Safford*, the defendant's attorney objected because "the fingerprint reports received in discovery did not list any points of comparison from which the expert could have drawn his conclusion of a match." *Id.* at 216. The trial court noted the objection, but allowed the expert to testify. The expert stated that he matched the print recovered in that case from a patrol car to the print standard of the defendant. The expert admitted that he did not record any notes on points of comparison. The expert also did not explain how he reached his conclusion. He noted only that the latent print matched a known print. The expert was unable to describe what he saw in common between the latent print and the known print. *Id.* at 220, 223. Because the expert provided no testimony as to how he arrived at his conclusion that the latent print could only belong to the defendant, his testimony lacked an adequate foundation and was inadmissible. *Id.* at 226. Thus, the court "agree[d] with the defendant that [the expert's] testimony amounted to no more than 'take my word for it,' where no opportunity to challenge that testimony is provided." *Id.* at 224.

¶ 37     However, here Kovacs not only generally explained the process of fingerprint

-8-

comparison, but he also went into detail about how he compared the prints specifically in this case, including a description of the various minutia he looked for in the comparison process. Kovacs compared the prints side-by-side with a "Henry" magnifying glass. Kovacs testified that he found unique areas in the minutia that matched, and that there was an identification of the latent print "A" to defendant's right palm standard and the latent print "B" to defendant's left palm standard. Kovacs also later confirmed his opinion with a new set of palm print standards from defendant. Kovacs repeated the entire ACEV process with the new set of confirmatory fingerprints. Kovacs again reidentified the right palm print "A" and left palm print "B" from the rear glass door of the Uriarte home as being defendant's palm prints.

¶ 38    We find Kovacs' testimony and foundation in this case similar to the testimony of the expert in *People v. Mitchell*, 2011 IL App (1st) 083143, where we held that the State's fingerprint expert's testimony had an adequate foundation. In *Mitchell*, just as in this case, the fingerprint expert explained the procedure she followed to make a comparison of the latent prints and the defendant's known prints. *Id.* ¶ 26. She then did a side-by-side comparison of the two sets of prints, looking for "certain things like pattern type, ridge flow, and things such as this. *** [Like] ridges that end, ridges that split into two, and short ridges or dots." *Id.* ¶ 14.

¶ 39    Though the expert in *Mitchell* testified regarding a number of points of comparison (*id.* ¶ 27), while Kovacs here did not detail the exact number of specific points of comparison, a technical minimum number of points of similarities is not required in order for such testimony to be admissible, and defendant does not cite to any authority holding that a minimum number is required. In fact, Kovacs explained at trial that "there was a time where certain jurisdictions did have a threshold," but the International Association for Identification, the organization that issues fingerprint examiner certification, no longer recognizes jurisdictions which require a certain number of points for fingerprint comparison. Defendant did not impeach this assertion by Kovacs, and on appeal he does not argue or provide any authority that there is any requirement of a minimum number of points.

¶ 40    Precedent holds that a contention regarding the number of points of fingerprint similarity goes to the weight of the evidence, not its admissibility. In *People v. Ford*, 239 Ill. App. 3d 314 (1992), the fingerprint expert testified that a latent print from the crime scene matched the defendant's left index finger, and he testified that no set number of characteristics was required for him to make this conclusion and that it was not his practice to note the number of corresponding characteristics he found in two comparison prints. *Id.* at 316. On appeal, the defendant attacked the sufficiency of this evidence, arguing the expert did not state the number of similar characteristics between the two prints. *Id.* at 317. The Fifth District Appellate Court rejected this argument, holding that the expert's failure to describe the points of similarity went to the weight of the evidence. *Id.* at 319. Although the issue in *Ford* was the sufficiency of the evidence, we find the reasoning on the fingerprint issue of points of comparison equally applicable here. Unlike the insufficient testimony of the expert in *Safford*, here Kovacs described the basis of his opinion that the prints matched, detailing his analysis process and reanalysis for confirmation. Any argument regarding a number of specific points of comparison went to the weight of his testimony for the jury to assess, not the admissibility of his testimony.

¶ 41    Apart from *Safford*, defendant has no other argument that Kovacs' testimony should not have been admitted. We underscore the fact that *Safford* is an outlier case and no reported case since then has held that there must be a minimum number of points of fingerprint comparison or a disclosure of a specific number of points of similarity found by the expert. The dissent in *Safford* noted that it could "find no authority that supports the proposition that the lack of detail we find here is devastating enough to bar a qualified and experienced fingerprint examiner's opinions," and that "the lack of testimony concerning the number of points of comparison went to the weight of [the expert's] opinions, not their admissibility." *Safford*, 392 Ill. App. 3d at 231 (Wolfson, J., dissenting). In his dissent, Justice Wolfson cited to the holding in *Ford* that "the lack of numbers was a matter of weight and credibility for the factfinder." *Safford*, 392 Ill. App. 3d at 232 (citing *Ford*, 239 Ill. App. 3d 314).

¶ 42    Here the number of points of comparison is part of the facts underlying the expert opinion and the burden was on the defense to elicit such facts. The Illinois Supreme Court adopted Federal Rule of Evidence 705 (Fed. R. Evid. 705) more than 30 years ago, and "[u]nder Rule 705 the burden is placed upon the adverse party during cross-examination to elicit the facts underlying the expert opinion." *Wilson v. Clark*, 84 Ill. 2d 186, 194 (1981) (citing *Bryan v. John Bean Division of FMC Corp.*, 566 F.2d 541, 545 (5th Cir. 1978)). The defense performed a vigorous cross-examination of Kovacs regarding his lack of notes and the fact that he did not rest his analysis or ultimate opinion on a specific number of comparison points, but the jury determined the weight of credibility was with the State's expert witness. The trial court did not abuse its discretion in allowing the expert opinion testimony of Kovacs.

¶ 43                                  B. DNA Expert

¶ 44    Defendant's other argument on appeal is that the testimony of Gina Pineda regarding the results of the DNA analysis at Cellmark violated his sixth amendment right of confrontation under *Crawford v. Washington*, 541 U.S. 36 (2004), because she is not the individual who actually performed the analysis. In *Crawford*, the United States Supreme Court held that the confrontation clause prohibits the introduction of hearsay statements against the accused if they are deemed "testimonial" in nature, unless the declarant is unavailable for trial and the defendant has had a prior opportunity to cross-examine the declarant. *Crawford*, 541 U.S. at 59. However, *Crawford* did not conclusively define which statements are "testimonial," leaving it to state and federal courts.

¶ 45    In *People v. Williams*, 238 Ill. 2d 125 (2010), the Illinois Supreme Court held that despite the fact that an expert witness did not perform the analysis herself, the expert provided a sufficient foundation for her testimony. *Williams*, 238 Ill. 2d at 140. "[The analyst] conducted an independent evaluation of data related to samples of genetic material, including items processed at both Cellmark and the ISP Crime Lab." *Id.* The Illinois Supreme Court found she "did not merely regurgitate results generated by a machine." *Id.* The court thus held that the State laid a proper foundation to show that the analyst also testified that Cellmark's testing and analysis methods were generally accepted in the scientific community.

¶ 46    This court subsequently applied *Williams* in holding that the testimony of a Cellmark

-10-

technical reviewer regarding the laboratory work and analysis conducted at Cellmark by other forensic scientists was admissible. See *People v. Johnson*, 406 Ill. App. 3d 805 (2010).

¶ 47    The trial court in this case denied defendant's pretrial motion to exclude Pineda's testimony as an expert witness on the basis of the holdings of *Johnson*, 389 Ill. App. 3d 618, and *Williams*, 385 Ill. App. 3d 359.

¶ 48    Although defendant has asked us to hold that *Williams* was wrongly decided by the Illinois Supreme Court, a few months after briefing on appeal was completed the United States Supreme Court affirmed the Illinois Supreme Court's decision in *Williams*. See *Williams v. Illinois*, 567 U.S. ___, 132 S. Ct. 2221 (2012) (plurality op.).[2] In *Williams*, a majority of the Supreme Court, comprised of Chief Justice Roberts and Justices Kennedy, Breyer, Alito, and Thomas (who concurred in the judgment) held that the confrontation clause of the sixth amendment was not implicated by expert opinion testimony from a forensic DNA analyst who did not personally conduct the DNA analysis and affirmed the judgment of the Illinois Supreme Court. However, Justice Thomas's rationale differed from the plurality. We glean the central holding of *Williams* from the narrow grounds on which Justice Thomas agreed with the plurality. "When there is no majority support for the rationale of an opinion, the holding of the Court can be viewed as the position taken by the members who concurred in the judgment on the narrowest grounds." *People v. Leach*, 2012 IL 111534, ¶ 163 (Kilbride, C.J., dissenting) (citing *Marks v. United States*, 430 U.S. 188, 193 (1977)).

¶ 49    The plurality of the Court, composed of Chief Justice Roberts and Justices Alito, Kennedy, and Breyer, concluded that the confrontation clause was not violated for the following reasons:

> "We now conclude that this form of expert testimony does not violate the Confrontation Clause because that provision has no application to out-of-court statements that are not offered to prove the truth of the matter asserted. When an expert testifies for the prosecution in a criminal case, the defendant has the opportunity to cross-examine the expert about any statements that are offered for their truth. Out-of-court statements that are related by the expert solely for the purpose of explaining the assumptions on which that opinion rests are not offered for their truth and thus fall outside the scope of the Confrontation Clause." *Williams*, 567 U.S. at ___, 132 S. Ct. at 2228.

The plurality further noted: "For more than 200 years, the law of evidence has permitted the sort of testimony that was given by the expert in this case. Under settled evidence law, an expert may express an opinion that is based on facts that the expert assumes, but does not know, to be true." *Williams*, 567 U.S. at ___, 132 S. Ct. at 2228. The plurality concluded "that this form of expert testimony does not violate the Confrontation Clause because that provision has no application to out-of-court statements that are not offered to prove the truth of the matter asserted." *Id*. at ___, 132 S. Ct. at 2228. The plurality also stated that the report of Cellmark was nontestimonial and admissible under the confrontation clause because it did

---

[2]The State moved to cite this additional authority on appeal, and we granted the motion.

not have the primary purpose of establishing the guilt of a targeted individual. *Williams*, 567 U.S. at ___, 132 S. Ct. at 2225.

¶ 50 Justice Thomas concurred in the judgment in *Williams* and "agree[d] with the plurality that the disclosure of Cellmark's out-of-court statements through the expert testimony of Sandra Lambatos did not violate the Confrontation Clause." *Williams*, 567 U.S. at ___, 132 S. Ct. at 2255 (Thomas, J., concurring in the judgment). However, he did not agree with the plurality's rationale, instead writing in his concurrence that he reached this conclusion "solely because Cellmark's statements lacked the requisite 'formality and solemnity' to be considered ' "testimonial" ' for purposes of the Confrontation Clause." *Williams*, 567 U.S. at ___, 132 S. Ct. at 2255 (Thomas, J., concurring in the judgment) (citing *Michigan v. Bryant*, 562 U.S. ___, ___, 131 S. Ct. 1143, 1167 (2011) (Thomas, J., concurring in the judgment)). As Justice Thomas explained, he "share[d] the dissent's view of the plurality's flawed analysis," viewing the statements in the Cellmark report as hearsay, and stating, "there was no plausible reason for the introduction of Cellmark's statements other than to establish their truth." *Williams*, 567 U.S. at ___, 132 S. Ct. at 2255-56 (Thomas, J., concurring in the judgment). The dissent's view was that the report was hearsay and that allowing a different expert to testify to the contents of the report was a violation of the confrontation clause. *Williams*, 567 U.S. at ___, 132 S. Ct. at 2264-77 (Kagan, J., dissenting, joined by Scalia, Ginsburg and Sotomayor, JJ.). Thus, the only single rationale joined by five Justices in *Williams* was that the testimony by the DNA analyst who did not perform the DNA analysis did not violate the confrontation clause. However, there is no consensus as to *why* such testimony does not violate the confrontation clause.

¶ 51 After *Williams* was decided by the United States Supreme Court, the Illinois Supreme Court decided *People v. Leach*, 2012 IL 111534. In *Leach*, both expert testimony regarding an autopsy report and the autopsy report itself were admitted into evidence. After finding that the autopsy report was admissible under exceptions to the hearsay rule and under state statute (*Leach*, 2012 IL 111534, ¶ 75), the Illinois Supreme Court considered whether the admission of the autopsy report violated the confrontation clause under the rule of *Crawford v. Washington*, 541 U.S. 36 (2004). The court in *Leach* summarized Supreme Court decisions on the confrontation clause, including the primary purpose test announced in *Davis v. Washington*, 547 U.S. 813 (2006), which distinguished between nontestimonial and testimonial statements as follows:

"Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis*, 547 U.S. at 822.

The court recognized that in *Davis*, Justice Thomas concurred in the judgment in part and dissented in part because he objected to the majority's primary purpose test as unpredictable and, in his view, out-of-court statements that lack "some degree of solemnity" are not testimonial in nature. *Leach*, 2012 IL 111534, ¶ 84 (quoting *Davis*, 547 U.S. at 834-36 (Thomas, J., concurring in the judgment in part and dissenting in part)).

¶ 52    The Illinois Supreme Court in *Leach* explained its view of the plurality rationale in *Williams* as follows:

> "When we must determine whether a forensic report is testimonial in nature, the *Williams* plurality instructs us to apply an objective test, looking for 'the primary purpose that a reasonable person would have ascribed to the statement, taking into account all of the surrounding circumstances.' [*Williams*, 567 U.S.] at ___, 132 S. Ct. at 2243. If this inquiry reveals that the forensic report was 'made for the purpose of proving the guilt of a particular criminal defendant at trial' (*id.* at ___, 132 S. Ct. at 2243), it is testimonial." *Leach*, 2012 IL 111534, ¶ 120.

¶ 53    The Illinois Supreme Court went on to describe the *Williams* dissent's view:

> "The *Williams* dissent rejects this focus on the targeting of a particular individual, reminding us that *Davis* formulated the test as whether the out-of-court statement was 'made for the primary purpose of establishing "past events potentially relevant to later criminal prosecution"–in other words, for the purpose of providing evidence.' [*Williams*, 567 U.S.] at ___, 132 S. Ct. at 2273 (Kagan, J., dissenting, joined by Scalia, Ginsburg and Sotomayor, JJ.) (quoting *Davis*, 547 U.S. at 822). The dissent accuses the plurality of adopting, without explanation, a new formulation of the primary purpose test when forensic testing is involved, asking whether the report was prepared 'for the primary purpose of accusing a targeted individual.' " *Leach*, 2012 IL 111534, ¶ 121 (quoting *Williams*, 567 U.S. at ___, 132 S. Ct. at 2273).

¶ 54    The Illinois Supreme Court held in *Leach* that "whichever definition of primary purpose is applied, the autopsy report *** was not testimonial because it was (1) not prepared for the primary purpose of accusing a targeted individual or (2) for the primary purpose of providing evidence in a criminal case." *Leach*, 2012 IL 111534, ¶ 122. The court in *Leach* reasoned that "the autopsy report did not bear testimony against the defendant. Nothing in the report directly linked defendant to the crime. Unlike a DNA test which might identify a defendant as the perpetrator of a particular crime, the autopsy finding of homicide did not directly accuse defendant." *Leach*, 2012 IL 111534, ¶ 132. The court concluded that the autopsy report was properly admitted as it was nontestimonial in nature because it "was neither 'the equivalent of affidavits made for the purpose of proving the guilt of a particular criminal defendant at trial' (*Williams*, 567 U.S. ___, 132 S. Ct. at 2243), nor prepared for the primary purpose of providing evidence in a criminal case (*Davis*, 547 U.S. at 822)." *Leach*, 2012 IL 111534, ¶ 137.

¶ 55    However, as Chief Justice Kilbride points out in the dissent in *Leach*:

> "The most that can be gleaned from the plurality opinion in *Williams* is simply that a majority held the admission of the DNA profile under the facts of that case was permissible. The majority erroneously relies on the analysis of one justice in *Williams* to support its analysis in this case." *Leach*, 2012 IL 111534, ¶ 163 (Kilbride, C.J., dissenting).

¶ 56    Although the Illinois Supreme Court has applied *Williams*, *Leach* did not involve expert testimony based on a DNA analysis in a report, as *Williams* did. We therefore find the narrow holding by the Supreme Court majority in *Williams* applicable in this case, that the admission

of the expert testimony of an expert who did not perform the DNA analysis in a report does not violate the confrontation clause. Although there is no clear consensus on the underlying rationale for admission of such expert testimony from either the United States Supreme Court or the Illinois Supreme Court, under *Williams* the narrowest point of agreement of five of the Justices was that an expert may testify regarding the DNA analysis in a report prepared by another analyst without violating the confrontation clause. We also note that, as in *Williams*, the report and notes themselves were not admitted into evidence in this case. The confrontation clause was not violated here.

¶ 57     As the Illinois Supreme Court has addressed both formulations of the primary purpose test (*Leach*, 2012 IL 111534, ¶¶ 118-22), while the Supreme Court is divided, we note that the *Williams* plurality addressed both formulations of the primary purpose test specifically regarding a DNA report, as in the present case. The plurality in *Williams* noted that the DNA report at issue did not meet either formulation of the primary purpose test, as it was not (1) prepared for the primary purpose of accusing a targeted individual or (2) for the primary purpose of providing evidence in a criminal case. The *Williams* plurality noted that the DNA report was not clearly prepared for the primary purpose of accusing one targeted individual, as the defendant was not under suspicion when the victim's swab samples were sent to the laboratory for DNA testing. *Williams*, 567 U.S. at ___, 132 S. Ct. at 2243. In *Williams*, a computer match was generated of the male DNA profile found in semen from the swabs of the victim to a male DNA profile that was identified as having originated from *Williams*. *Williams*, 567 U.S. at ___, 132 S. Ct. at 2227. Thus, the DNA report was not prepared for the primary purpose of targeting *Williams*.

¶ 58     The *Williams* plurality stated:

"Here, the primary purpose of the Cellmark report, viewed objectively, was not to accuse petitioner or to create evidence for use at trial. When the ISP lab sent the sample to Cellmark, its primary purpose was to catch a dangerous rapist who was still at large, not to obtain evidence for use against petitioner, who was neither in custody nor under suspicion at that time. Similarly, no one at Cellmark could have possibly known that the profile that it produced would turn out to inculpate petitioner–or for that matter, anyone else whose DNA profile was in a law enforcement database. Under these circumstances, there was no 'prospect of fabrication' and no incentive to produce anything other than a scientifically sound and reliable profile. [*Michigan v. Bryant*, 562 U.S. ___, 131 S. Ct. 1143, 1157 (2011).]

The situation in which the Cellmark technicians found themselves was by no means unique. When lab technicians are asked to work on the production of a DNA profile, they often have no idea what the consequences of their work will be. In some cases, a DNA profile may provide powerful incriminating evidence against a person who is identified either before or after the profile is completed. But in others, the primary effect of the profile is to exonerate a suspect who has been charged or is under investigation. The technicians who prepare a DNA profile generally have no way of knowing whether it will turn out to be incriminating or exonerating–or both." *Williams*, 567 U.S. at ___, 132 S. Ct. at 2243-44.

Thus, the plurality in *Williams* addressed both primary purpose tests specifically regarding DNA reports. However, the plurality's reasoning, as explained above, is not precedential.

¶ 59 As the Illinois Supreme Court has applied both formulations of the primary purpose test in *Leach*, under this precedent, we modify our opinion to note that in the case before us, the DNA report was "(1) not prepared for the primary purpose of accusing a targeted individual or (2) for the primary purpose of providing evidence in a criminal case." *Leach*, 2012 IL 111534, ¶ 122. The blood sample from the tissue found in the Uriarte home was tested and a DNA profile was generated by Cellmark at a time when defendant was not yet under suspicion. The DNA profile generated from the sample was entered into a DNA database to search for a match, and there was a match for a person later identified as defendant. At that point, a buccal swab was taken from defendant and tested. At the time the test was performed, the laboratory analysts at Cellmark had no idea what the results would be.

¶ 60 We repeat our previous discussion of the nature of DNA reports. The science of DNA testing has evolved to the point where it can statistically identify or exclude a suspect and courts have widely accepted the science as reliable. See *In re Jessica M.*, 399 Ill. App. 3d 730, 743-48 (2010) (describing the evolution of DNA analysis, including the statistical aspect of DNA profiling). The testing can include or *exclude* suspects. This court in *In re Jessica M.* described the science of PCR testing, the exact test which was performed by Cellmark in this case. A class of polymorphisms in the double-helix strands of DNA called "short tandem repeats" (STRs) are relatively short in base pair length and are amplified by the PCR process. *In re Jessica M.*, 399 Ill. App. 3d at 744. The number of repeats in these STR markers used in the PCR process for DNA analysis "can be highly variable among individuals, which makes them particularly desirable for identification determinations." *In re Jessica M.*, 399 Ill. App. 3d at 744 (citing John M. Butler, Forensic DNA Typing: Biology & Technology Behind STR Markers 53 (2001)). The science is such that it buttresses the plurality's view in *Williams*.

¶ 61 Thus, it appears that the instant case would satisfy both the *Williams* plurality's primary purpose test and the *Williams* dissent's primary purpose test. Although the Illinois Supreme Court applied both the *Williams* plurality and dissent's primary purpose tests regarding whether a report is testimonial in *Leach* to an autopsy report, it has not yet done so for DNA reports. As this area of the law is still unclear, we ultimately rely on only the narrow majority holding of *Williams* in holding that the expert testimony regarding the DNA report in this case was admissible and did not violate the confrontation clause.

¶ 62 Further, if there are any concerns regarding the testing procedures in Illinois defendants can request a viewing of any analysis conducted by the Illinois State Police. Section 116-5(c) of the Code of Criminal Procedure of 1963 provides:

"If requested by the defense, a defense representative shall be allowed to view any genetic marker grouping analysis conducted by the Department of State Police. The defense shall be provided with copies of all documentation, correspondence, including digital correspondence, notes, memoranda, and reports generated in relation to the analysis." 725 ILCS 5/116-5(c) (West 2006).

¶ 63 To seek a pretrial DNA database search comparing the genetic profile from forensic

evidence in relation to criminal proceedings against a defendant against the genetic profile of the defendant, a defendant must show only that it may be material to the defense investigation. 725 ILCS 5/116-5(a) (West 2006). We have held that "by this enactment, the legislature has codified the accepted forensic science uses of DNA profiling both in apprehending or excluding suspects and in calculating statistical probabilities of DNA profiles for use in criminal trials." *In re Jessica M.*, 399 Ill. App. 3d at 749. Thus, defendant had the right to also request a DNA comparison. Here, however, there was no issue regarding the testing which formed the basis of Pineda's opinion.

¶ 64     Given the Supreme Court's narrow majority holding in *Williams* allowing an expert to testify regarding such reports and holding that such testimony is not a confrontation clause violation, we hold that Pineda's testimony concerning the DNA report as the basis for her opinion that defendant's DNA matched the tissue sample in this case did not violate the confrontation clause. However, upon our denial of defendant's petition for rehearing and considering the case further, we wish to point out a distinction that no one has raised, which is that this case involved a jury trial, unlike *Williams* and *Leach*, which were bench trials. We see a potential concern regarding the admission of such testimony based on DNA reports prepared by nontestifying witnesses in jury trials. Juries may or may not appreciate the nonhearsay distinction that the underlying facts in these reports are not offered for the truth of the matter asserted as well as a judge in a bench trial may, especially where DNA and other forensic evidence are now frequently referred to as almost conclusive evidence in common parlance.[3] However, we feel that the instant case is not an appropriate one to address this concern, as the evidence was strong in this case and there is no indication that the jury either felt the evidence was close or had questions concerning the evidence. Even if one could conclude that the admission of the expert testimony concerning the DNA report was error, we would find such error was harmless given the fingerprint evidence.

¶ 65     We also note another distinction between the present case and *Williams* and *Leach* which allays some of our concern regarding the admission of such testimony, which is that Pineda's testimony in this case laid more of a foundation regarding the laboratory analysis performed at Cellmark than was present in *Williams*. Pineda testified regarding the four-step polymerase chain reaction (PCR) testing procedure for DNA analysis that Cellmark performed: extraction (separating the DNA from any other substance in the sample); quantitation (determining how much DNA there is); amplification; and obtaining a profile. The final resulting DNA profile is comprised of 13 genetic markers, which are viewed using special software. Pineda testified there is a required minimum of relative fluorescent units (RFUs) in order to read the results, and at Cellmark this minimum is 100. Pineda also explained that in the blood sample in defendant's case, there were no peaks in the data below 100 RFUs, meaning the DNA sample from the blood on the tissue was from only one individual. The testing of the sample revealed that there was only one individual contributing the DNA and that the sample matched defendant. In *Williams*, the expert did not vouch for the accuracy

_____

[3]The difference between a jury and bench trial in considering such evidence is a point that was considered and ultimately rejected by the dissent in *Williams*. See *Williams*, 567 U.S. at ___, 132 S. Ct. at 2271 (Kagan, J., dissenting, joined by Scalia, Ginsburg and Sotomayor, JJ.).

of the profile generated by Cellmark. *Williams*, 567 U.S. at ___, 132 S. Ct. at 2227. *Leach* involved an autopsy report. *Leach*, 2012 IL 111534, ¶ 4.

¶ 66    We have modified our original opinion upon denial of defendant's petition for rehearing to explain that though the rationale supporting the holding of the United States Supreme Court in *Williams* was fractured, the majority did agree on the central holding that testimony regarding the DNA report does not violate the confrontation clause. We have also modified our opinion upon denial of the petition for rehearing to acknowledge the Illinois Supreme Court's holding in *Leach*, and to add our above summary of the ways in which the present case is distinguishable from both *Williams* and *Leach*. We reach the same conclusion that the testimony regarding the DNA report did not violate the confrontation clause and was properly admitted in this case. However, we have removed our reliance on the plurality's rationale in *Williams*, as the Illinois Supreme Court's recent decision in *Leach* applied both the plurality and the dissent's formulation of the "primary purpose" test in *Williams*, neither of which forms the basis of the majority holding in *Williams*, and thus there still is no clear precedent establishing a rationale underlying the holding that expert testimony regarding a DNA report prepared by a nontestifying analyst does not violate the confrontation clause. Due to this lack of consensus on a rationale for the admission of testimony of an expert who did not prepare a DNA report, compared with the clear precedent regarding the fingerprint evidence, upon reconsideration we also determine that even if the admission of the DNA evidence could be considered error, it was harmless because of the strength of the fingerprint evidence.

¶ 67                                                III. CONCLUSION

¶ 68    We hold the trial court properly admitted the testimony of both the fingerprint expert and the DNA expert. First, the fingerprint expert laid a sufficient foundation for his expert testimony that the prints recovered from the crime scene matched defendant's palm prints, in that he detailed the analysis process he specifically used in this case and was able to determine there was a match. There is no requirement for a set number of minimum points of similarity in order for fingerprint expert testimony to be admissible. Second, the DNA expert was properly allowed to testify regarding the results contained in Cellmark's DNA analysis report and notes pursuant to the United States Supreme Court's holding in *Williams*, 567 U.S. ___, 132 S. Ct. 2221, and pursuant to the Illinois Supreme Court's holding in *Leach*, 2012 IL 111534. The expert testimony regarding the DNA report did not violate the confrontation clause of the sixth amendment. Even if one could conclude that the admission of the expert testimony concerning the DNA report were error, we would regard the error as harmless given the fingerprint evidence.

¶ 69    Affirmed.

¶ 70    JUSTICE EPSTEIN, specially concurring.

¶ 71    I concur in the result reached by the majority and write separately to underscore my respectful disagreement with the majority holding in *People v. Safford*, 392 Ill. App. 3d 212

(2009). In this case I believe, as did the dissent in *Safford*, that the marked lack of specificity provided by the fingerprint examiner was sufficient to meet the standard for admission of his opinion. The deficiencies of recall and documentation of his examination were considered by the jury in assessing the weight to be accorded the opinion.