# Illinois Official Reports

## Appellate Court

---

### *People v. Jones*, 2015 IL App (1st) 121016

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOE JONES, Defendant-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-12-1016 |
| Modified opinion filed<br>Rehearing denied | April 22, 2015<br>July 21, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-CR-19575; the Hon. Jorge Luis Alonso, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Abishi C. Cunningham, Public Defender, of Chicago (Evelyn G. Baniewicz, Assistant Public Defender, of counsel), for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Douglas P. Harvath, and Tasha-Marie Kelly, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE PUCINSKI delivered the judgment of the court, with opinion.<br>Justice Hyman concurred in the judgment and opinion.<br>Justice Mason dissented, with opinion. |

¶ 1 All expert opinion testimony requires an adequate foundation. The foundation requires a factual reason or basis for the expert's opinion. Where no factual basis is given, "trust me" is not enough.

¶ 2 The defendant was convicted in a jury trial of first-degree murder based on circumstantial evidence and the expert opinion testimony of a firearm/toolmark examiner who identified the bullet found by the victim as being fired from defendant's gun. Defendant argues that the court erred in admitting the firearm/toolmark examiner's expert opinion testimony. We agree and hold the court erred in allowing the testimony of the firearm/toolmark identification expert because the expert's testimony lacked an adequate foundation where the expert testified that he found "sufficient agreement" but did not testify to any facts that formed the bases or reasons for this ultimate opinion that the bullet matched defendant's gun.

¶ 3 We further hold that the expert's opinion testimony substantially prejudiced defendant, as it essentially placed the murder weapon in defendant's hands, and thus we reverse and remand for a new trial.

¶ 4 Defendant also argues that the evidence was insufficient to prove him guilty beyond a reasonable doubt, but due to our disposition we do not reach this issue.

¶ 5 Defendant further argues that the court also erred in not giving a second-degree murder instruction. We hold that defendant waived this argument by not including it in his posttrial motion, and the plain error exception to waiver does not apply here because, even if there were any error, such error was invited by defendant where he indicated to the court that he did not want the instruction.

¶ 6                                    BACKGROUND

¶ 7 Defendant, Joe Jones, was charged with the first-degree murder and armed robbery of his friend Ivory Anderson that occurred on September 12, 2008, near the intersection of Garfield Boulevard and Winchester Avenue in Chicago, Illinois. Defendant was charged via indictment with several counts of first-degree murder and two counts of armed robbery. The following facts are from the testimony at trial.

¶ 8 The day of the shooting, defendant was with Ivory Anderson and Valerie Myrick, known to her friends as "Red," at defendant's house on the 5600 block of South Seeley Avenue in Chicago, Illinois. Defendant was Valerie's boyfriend at the time, and Valerie and Ivory had been friends for about 20 years. Valerie drank and did drugs with both Ivory and defendant and partied in defendant's basement. That night, the three of them were smoking crack cocaine and drinking alcohol.

¶ 9 Shortly before 9:30 p.m., Valerie, Ivory and defendant ran out of cocaine and Ivory suggested that they go buy more. Neither Valerie nor defendant had any money, so Ivory offered to go to his house to get some money. After Ivory got some money, the three began walking toward Winchester and 55th Street (Garfield Boulevard), where they planned to buy cocaine. Drugs were sold at a house on the corner of 55th Street and Winchester Avenue. Around the same time, Danies Escobar and her boyfriend Stanley Sparks were standing under the canopy of a currency exchange located nearby at 55th Street and Damen Avenue. Danies and Stanley earned their living by selling "cigarettes" at this location for 50 cents apiece.

Danies had known Ivory for about 25 years, had been friends with Valerie for about 18 years, and had known defendant for about 7 or 8 years. Danies also partied in defendant's basement. Stanley also knew Valerie, Ivory and defendant and sometimes also partied in defendant's basement.

¶ 10    Danies and Stanley saw Valerie, Ivory and defendant approach them. Defendant was wearing a long blue denim jacket. As Valerie, Ivory and defendant approached, Valerie split and proceeded toward a gas station to get cigarettes and a cigarette lighter. Ivory gave Valerie a roll of quarters and Valerie went inside the gas station.

¶ 11    After Valerie went inside the gas station, Danies and Stanley heard gunshots. Danies heard four or five shots and all the shots had the same sound. Stanley testified that he heard two shots, then two or three more, and stated that the shots all sounded alike to him, like they came from the same gun. To Stanley, the shots sounded like they came from a .38-caliber gun. Stanley testified that he may have told Detective Lewis that he heard two shots, a pause, and then four more shots.

¶ 12    After hearing the gunshots, Danies and Stanley immediately went through the alley and headed toward 55th Street and Winchester Avenue, because Stanley's son frequented the area and they were concerned for him. There were no cars or people in the alley. At the end of the alley, they looked both ways and did not see anyone. When they got to the area, they looked around and did not see anyone at first. Danies saw two umbrellas and a lot of blood on the ground. Danies and Stanley were turning to walk away when they saw a body in between the garage at 5512 S. Winchester Avenue and the alley. Danies and Stanley both did not recognize who it was at first.

¶ 13    Meanwhile, Valerie came out of the gas station and did not see defendant and Ivory, who were supposed to wait for her at the corner. As she looked around for them, defendant came running toward her and said, "your friend just got shot." Defendant did not say how it happened or who shot Ivory. Valerie ran toward the other side of the boulevard to where Danies and Stanley had just discovered the body. Danies and Stanley were standing by the body but still did not recognize who it was. When Valerie arrived, she screamed, "Oh, hell, no, he shot Ivory ***." Valerie began screaming Ivory's name and telling him to "hold on." Danies then realized it was Ivory, saw blood around his head, and ran toward the gas station and found a police officer on 55th Street, coming off Damen. She told the officer there was a man lying down at 55th and Winchester. Danies then went back to where Ivory was and stayed there until the police came. Stanley saw that Ivory's head wound "was really bad" and that Ivory's torso was covered in bloodstains. Danies flagged down a marked police car on 55th Street, turning from Damen Avenue, and returned to where Ivory was.

¶ 14    When the police arrived on the scene, Danies gave officers her name and address and went to the home of Ivory's sister, Dorothy Hunter, to tell her what happened. Danies told Dorothy and remained with her for about 15 to 20 minutes and then returned to 55th and Damen. Dorothy then proceeded to 55th and Winchester. When she reached the alley, she saw Ivory's body covered with a white sheet and was told she could not walk closer because it was still a crime scene. A short time later, her nephew, who was a police officer, arrived and identified the body as Ivory. Ivory Anderson was later pronounced dead from a gunshot wound to his back. The manner of death was ruled homicide.

¶ 15    After Valerie talked to the police at the scene, she saw defendant near 55th and Damen. They walked together toward the E&J liquor store. Valerie asked defendant what had

happened, and defendant told her that "two guys came behind them and tried to stick them up." Defendant said that "one guy pulled a gun and started shooting" and so defendant "pulled his gun and was shooting back." Valerie asked defendant if he killed Ivory and defendant said, "no." Valerie and defendant went to Valerie's house and slept there that evening.

¶ 16       About 20 minutes after the shooting, at 55th and Damen, Danies and Stanley ran into Valerie and defendant by the bus stop in front of the gas station, near the E&J liquor store. Defendant was wearing a different jacket. When Danies and Stanley first saw defendant that night, he was wearing a long blue denim jacket, but when they saw him at the bus stop he was wearing a black leather jacket. Stanley did not think it was significant that defendant had changed his jacket, as it had been raining all day. Danies and Stanley stopped outside the liquor store on the sidewalk. Danies testified that Valerie was crying but defendant was not saying anything and was acting "jittery and nervous." Defendant started talking about a car accident where people were hurt at the bus stop in front of the gas station that took place 20 to 30 minutes after the shooting. Danies did not ask defendant about Ivory's shooting, and defendant did not talk about it or ask about it. Stanley testified it was not much of a conversation and they were with defendant for two or three minutes. After a few minutes, Valeri and defendant went to the liquor store and Danies and Stanley left and slept at Valerie's house.

¶ 17       Chicago police department personnel arrived at the scene of the shooting at 5512 South Winchester to begin investigating and processing the scene. Detective John Halloran was assigned to the investigation, along with Detectives Garza, Gorman, Solecki, Butler, Cervin, and Wright, as well as Investigator Joseph Bembynista. At this point it was heavily raining. After interviewing witnesses, the detectives attempted to locate defendant but were unsuccessful. Valerie talked to the police at the scene. Stanley told the police his name was Otis Brown because he had a warrant for child support.

¶ 18       Retired Investigator Joseph Bembynista testified to his processing of the crime scene. Investigator Bembynista testified that when he arrived it was pouring rain. Ivory was lying on a garage drive next to a blue Pontiac. The driveway where Ivory was lying was slightly slanted down toward the alley. Bembynista found two spent .380-caliber shell casings approximately 17 feet southwest of the car, an overturned umbrella, a jacket and a sweater. The two cartridge cases were from different manufacturers: "Win"[1] and Remington. The investigators also found an overturned umbrella, a jacket and a sweater. Photographs were also taken of the scene, depicting blood splatter on a car door and on a panel of a garage door in the alley, People's Exhibit Numbers 12 and 15. Bembynista did not swab the blood on the garage door, the blood on the Pontiac, or the blood north of the car. Bembynista searched Ivory's body and found a fired bullet under this shirt. He did not find any money, wallet, or identification on Ivory.

¶ 19       Detective Halloran also testified regarding the processing of the crime scene. He was assigned to the investigation, along with Detectives Garza, Gorman, Solecki, Butler, Cervin, and Wright. Detective Halloran testified that two .380-caliber shell casings were found in the street about 25 feet south of Ivory's body at the mouth of the alley.

¶ 20       Detective Halloran sent Detectives Solecki and Butler to the Cook County medical examiner's office to observe Ivory's autopsy. When the bag containing Ivory's body was

_____

[1]According to the "Receipt for Physical Evidence" contained in the common law record, one cartridge case was a Winchester and the other a Remington.

- 4 -

opened and personnel began removing Ivory's body, a fired bullet fell out. Detective Solecki found a $20 bill, some change, keys, and a bottle of gin.

¶ 21    The bullet and the shell casings from the scene were sent to the Illinois State Police crime laboratory for testing.

¶ 22    Dr. James Filkins, a deputy medical examiner, reviewed Ivory's case, whose autopsy was originally performed by Dr. Michel Humilier.[2] Dr. Filkins reached an independent conclusion as to Ivory's cause of death to a reasonable degree of scientific certainty. Dr. Filkins opined that Ivory died from a single gunshot wound to the back, with damage to both his lungs and aorta. Ivory died from the shock of blood loss.

¶ 23    Danies testified that she did not see defendant with a gun on September 12. Before that date, she had seen him with a small black gun. Stanley had seen defendant carry a gun, a .380-caliber semiautomatic. Defendant had the gun for three or four weeks. Stanley thought defendant had the gun earlier in the day on the 12th, around noon, when they talked while sitting at the bus stop, but Stanley did not see it. Defendant said, "It is too hot out here, I am going to put this thing up." Defendant did not specifically refer to his gun, but Stanley thought that was what defendant was referring to. Stanley did not actually see the gun.

¶ 24    Two days after the shooting, on September 14, Valerie and defendant went to Dorothy Hunter's house to give Ivory's family their condolences. Dorothy Hunter was Ivory's older sister. Dorothy and six of her family members were there. Dorothy asked what happened to Ivory. Defendant told her that as he and Ivory were walking, two young men came up to them and said, "This is a stick-up, robbery, give me your money and wallet." Defendant described them as 19 to 20 years old. One of them was light-skinned, tall, wore a black hoodie, and had a gun. Defendant told the family that his nephew knew who the gunman was but he did not go to the police. The situation at Dorothy's house became chaotic and the police were called. Defendant was arrested and taken to the police station.

¶ 25    On September 14, 2008, Detectives Halloran and Gorman interviewed defendant in a taped interview. People's Exhibit No. 52 was a redacted typed version of their interview, which was published to the jury. In the taped interview, defendant said he was at the E&J liquor store with a man named Al and Valerie when Ivory stopped by. Ivory told Valerie that he would be back at 9 p.m. Ivory came back before 9 p.m., and he, defendant, and Valerie walked over to defendant's house, where they talked, smoked rock (crack cocaine), and drank gin. The three of them left defendant's mother's house to walk Ivory to his house. Ivory was going to get some money to smoke some more crack cocaine. Defendant and Valerie waited on the corner while Ivory went home. Ivory did not want his sister to see them. When Ivory came out of his house, he said he had a little money. They all then went down Winchester Avenue toward 55th Street. Before they crossed the street, Valerie left to get some cigarettes from the gas station. They told her they would meet her. Valerie left, and Ivory and defendant crossed the street going south on Winchester. They crossed 55th Street (Garfield Boulevard) and saw Danies's nephew selling drugs. Defendant described him as 19 to 20 years old, dark-complected, around 5 feet 10 inches to 6 feet tall, heavy set, with bushy hair and wearing a blue hooded sweatshirt. Defendant asked whether there was anything going on, meaning did he have any drugs, and the

---

[2]Dr. Humilier had left the medical examiner's office by the time of trial, and the State chose not to call him as a witness. No issue is raised on appeal concerning the testimony of Dr. Filkins testifying to his opinion on review of the original autopsy.

nephew said no. There was a second individual at the top of the stairs of the house on the corner. This individual was slender, 5 feet 10 inches to 6 feet, 1 inch, light-complected, and was wearing a grey hoodie.

¶ 26    Defendant said that a confrontation started on the sidewalk, by the alley. Defendant stated that the individual with the grey hoodie "ran up behind" Ivory and "snatched at his pocket" in a robbery attempt and that Ivory "swung his arm" and was "spun around." Defendant said that this individual then opened fire on Ivory, without any provocation. Defendant did not know if he heard two, three or four shots. Defendant denied that he had a weapon at the time Ivory was shot and denied shooting Ivory the night of September 12. Defendant told the detectives he had no reason to shoot Ivory.

¶ 27    On cross-examination, Detective Halloran acknowledged that if the shooter had a revolver, casings would not be found, as revolvers do not eject the cartridge cases; they stay inside the cylinder of the gun.

¶ 28    On the early morning of September 16, at about 3 a.m., Detectives Halloran and Gorman returned to the crime scene to conduct another search. The detectives looked for bullet impacts, fired bullets, shell casings, or any other physical evidence. They found two more .380 shell casings in the street, in front of 5514 South Winchester Avenue, which was south of the alley and the location where the original shell casings were found. The shell casings were forwarded to the crime lab for testing. The police did not search north of the corner and did not search the parkway or Garfield Boulevard (55th Street).

¶ 29    Later that afternoon, around 2 to 2:30 p.m., Detective Halloran and four other officers executed a search warrant for defendant's home at 5516 South Seeley. A Grendel .380-caliber semi-automatic pistol was found on a shelf in the basement storage room. The pistol contained one live round. It was sent to the crime lab for testing. Defendant's jacket was also inventoried but was never sent for testing.

¶ 30    Other detectives checked the businesses in the vicinity of the shooting for video surveillance footage. The video at the gas station showed Valerie inside the gas station at 9:40 p.m. Detective Halloran also canvassed the neighborhood for other witnesses but did not find any.

¶ 31    An individual named Charles Pettis also testified. Pettis was arrested on September 17, 2008 on a drug charge and was taken to the criminal court at 26th and California for a bond hearing. While in the receiving area he saw defendant in a cell. Pettis stated that he was friends with both defendant and Ivory and described his relationship with Ivory as "drinking buddies." Pettis asked defendant what happened to Ivory. According to Pettis, defendant denied shooting Ivory and told him that Ivory was shot by an individual who came up from behind a dumpster. Defendant said he fired one time at this individual. The individual shot at Ivory once and then three or four more times when Ivory was down. Defendant told Pettis that he went over to see if Ivory was still living and then took the money from his pocket and left. Three weeks after this conversation, the police picked up Pettis and questioned him. Pettis admitted that at the time of his arrest and conversation with defendant he used crack cocaine once a week and regularly drank a six-pack of beer a day but said the cocaine did not affect his memory. While he did not remember his arrest on September 18 or what he told police at that time, he did remember his conversation with defendant.

¶ 32    Prior to trial, defendant moved to suppress his statements, arguing that the detectives ignored the Illinois statute requiring the videotaping of all interrogations and defendant's

assertion of his constitutional rights. The trial court granted defendant's motion to suppress in part and suppressed the first unrecorded statement defendant made and the pre-*Miranda* summary of an earlier interview by Detective Halloran after he moved defendant to a room with recording equipment, ruling that recording was required. The court suppressed all statements made by defendant before *Miranda* warnings were given. The court allowed all of defendant's statements to Detective Halloran that followed defendant's *Miranda* rights. The court allowed the State to use the statement defendant made at 10:30 p.m. up until the interrogation by Detectives Lewis and Adams, but suppressed defendant's statements to Detectives Lewis and Adams because defendant made a clear invocation of his rights prior to that statement. We therefore do not consider defendant's statement to Detectives Lewis and Adams.

¶ 33 Defendant also filed a motion seeking to bar "misleading opinion statements by the prosecution concerning firearms identification," requesting that the State be barred from using phrases such as "to a reasonable degree of scientific certainty" or "to a reasonable degree of ballistic certainty." The State agreed that its firearms expert would not use such terms and that he would state his testimony was his "opinion" as to any identification of ballistics.

¶ 34 The State's firearms expert at trial was Justin Barr, a forensic scientist at the Illinois State Police laboratory who specialized in firearms identification. The trial court found Barr qualified to testify as an expert witness, without objection. Barr explained the basics of firearms identification to the jury, which is based on class characteristics of a weapon based on its caliber and other features determined prior to manufacture, such as rifling from the interior part of the barrel of a firearm, which creates lands and grooves and the direction of twists. Barr testified that these striated markings within the barrel are impressed onto the bullet as it travels down the barrel. Individual characteristics are the irregularities or imperfections that are caused by the manufacturing process or "abuse of the tool." A particular firearm will have its own set of individual characteristics that set it apart from other firearms. The comparison of fired test bullets from a particular firearm is made through a comparison microscope, which is "basically two compound microscopes connected by an optical bridge where two items can be seen in the same field of view." In making the comparison, he looks for striations, or scratch markings, on the bullet, "individual characteristics, or the overall pattern" that is "based on class and individual characteristics." Barr testified that "[t]he basis for an identification is sufficient agreement of class and individual characteristics." Barr testified that the question of what is "sufficient agreement" between the items is based on his training and experience. Barr testified that he does not use a national standard, and that examinations at the Illinois State Police laboratory are "just based on our training and experience, which is verified by another examiner," and that there is no Illinois State Police standard.

¶ 35 Barr testified that he received several pieces of evidence in this case, including the fired bullet recovered from Ivory's body, the Grendel Model P12 .380-caliber pistol recovered from defendant's home with one magazine and unfired cartridge, and the four fired cartridge casings recovered from the scene of the shooting. Barr examined the gun and determined that the rifling inside was "six right," meaning there were "six lands and grooves in the barrel with a righthand twist." Barr testified these were class characteristics. Barr did not testify to any individual characteristics of the gun. Then Barr fired the firearm to determine if it was in operable condition and fired two test shots using two unfired cartridges from the lab. He fired

the test shots through the gun into a water recovery tank. The test bullets and their cartridge casings are also the control group used to compare to the recovered bullet and casings.

¶ 36    Barr then compared those test bullets to the bullet recovered from Ivory's body and the test casings to the casings that were recovered from the scene. In making the comparison, Barr used a comparison microscope with two stages, one on the right and one on the left, and through the oculars he sees both sides to compare. Barr determined that there was sufficient agreement between the bullet recovered from Ivory's body and the test bullets fired from defendant's gun and that the bullet recovered from Ivory's body was fired from defendant's gun. Barr also compared the four cartridge casings under the comparison microscope and determined that they also were fired from defendant's gun.

¶ 37    Following Barr's testimony on direct examination, defense counsel made an objection on "foundation" that was "based on *Safford* [(*People v. Safford*, 392 Ill. App. 3d 212 (2009))] in that we don't believe that a foundation has been properly laid or discovery properly given as to the specifics of the striations that this examiner used to come to his conclusion." The State responded that this area of inquiry was proper for cross-examination. The trial court overruled the objection.

¶ 38    On cross-examination, Barr explained that at the Illinois State Police crime lab, they "don't really count the number of lines or how many things were in agreement, but it is an overall pattern based on class and individual characteristics." Barr testified that "there is no set number of how many lines" he was looking for and the striations "don't all have to line up," and that examiners at the Illinois State Police laboratory "don't count them." Barr also testified that he does not look at every single line. Barr testified that the standard used to make the determination whether there was an identification is "sufficient agreement" and that this standard is commonly accepted in his field. Barr testified there is no specific standard as to the number of markings which have to match; each examiner decides on his or her own what is sufficient agreement. Barr testified that the question of what constitutes "sufficient agreement" between the two bullets for comparison is based on his training and experience. Barr further testified that he heard of the practices of "consecutive matching stria[tions]" and line counting, but those practices are not used in the Illinois State Police Laboratory. Barr was not aware of the quantifiable method, which uses a number standard.

¶ 39    Barr also testified that the Illinois State Police laboratory uses a verification system, where each examiner asks an available coworker to verify the conclusion. Barr concluded that the recovered fired bullet was fired from defendant's pistol. Barr then lined up his microscope at the index mark and asked another technician to verify it. Barr told the other technician it was an identification, and the other technician agreed with Barr's findings. Barr did not recall any other technician ever disagreeing with him or him disagreeing with any other technician. Barr knew there had been disagreements in the laboratory but was not sure if they kept track of them. Barr further explained there is no set procedure for choosing a verifier. The verifier is free to make his own determination.

¶ 40    On cross-examination, Barr testified that he did not know specifics of the gun manufacturing process, how the lands and grooves were made within a gun, and whether all guns produced by a manufacturer on the same day had the same lands and grooves. On redirect, Barr clarified that all guns made on a particular day may have the same class characteristics.

¶ 41      On redirect, Barr agreed that he uses methods and procedures commonly accepted in the area of firearms examination to determine whether a certain piece of evidence was fired from a particular firearm, but then it is his determination if a sufficient agreement of class and individual characteristic are present.

¶ 42      At the close of all the evidence, defendant's motion for a directed verdict was denied.

¶ 43      Defense counsel requested an instruction on self-defense, the "justified use of force" instruction, which was granted over the State's objection. At the final jury instruction conference, defendant informed the court that he did not want an instruction on the lesser offense of second-degree murder. The State nol-prossed the felony murder and armed robbery counts.

¶ 44      During jury deliberations, the jury sent the following note: "We want to see [defendant's] interragation [*sic*] video." The video was played for the jury in the courtroom by the sheriff. After further deliberation, the jury returned a verdict finding defendant guilty of murder, finding that defendant personally discharged a firearm that proximately caused the murder of another person.

¶ 45      Defendant filed a motion for a new trial, arguing that: (1) he was not proven guilty beyond a reasonable doubt; (2) the court erred in denying his pretrial motion to suppress statements; (3) the court erred in denying his pretrial motion to exclude evidence of the gun and bullet identification evidence; (4) the court erred in not excusing a certain juror who had been recalled to work; (5) the court erred in denying the defendant's objection to the expert opinion conclusions of forensic scientist Justin Barr on the ground that a proper foundation for his opinion was not laid; (6) the court erred in denying defendant's motion to exclude the videotape of the defendant's interrogation when the State had not timely redacted it pursuant to court order, causing the trial to be unreasonably delayed; (7) the court erred in allowing Dr. James Filkins to testify as a substitute medical examiner, in violation of defendant's sixth amendment rights; (8) the defendant did not receive a fair and impartial trial; (9) the court erred in overruling the defendant's motion for a directed verdict at the end of the case; and (10) the assistant State's Attorney made burden-shifting statements in closing argument. Defendant did not include any argument concerning jury instructions. The trial court held a hearing and then denied the motion.

¶ 46      At sentencing, the court heard victim impact statements from the following individuals: Brenda A. Walls and Erma Anderson, Ivory's daughters; James Deans, Ivory's brother; Dorothy Hunter, Ivory's sister; and Linda Hunter, Ivory's niece. Following arguments in aggravation and mitigation and defendant's statement that he fired in self-defense, the trial court imposed a sentence of 55 years: 30 years for first-degree murder; and 25 years for the firearm sentencing enhancement. Defendant appealed.

¶ 47                              ANALYSIS

¶ 48      Defendant argues the following: (1) the court erred in admitting Barr's expert testimony concerning the firearm identification; (2) his guilt was not proven beyond a reasonable doubt; and (3) the court erred in failing to give a second-degree murder instruction.

¶ 49                          I. Expert Firearm Identification Opinion Testimony:

                                        "Trust Me" Is Not Enough

¶ 50         Defendant first argues that the court erred in admitting the expert opinion testimony of the
State's firearm/toolmark expert examiner, Justin Barr, and that this error was substantial,
affected the outcome of his trial, and denied him a fair trial. We agree.

¶ 51                        A. Requirements for Admission of Expert Testimony:

                            All Expert Testimony Must Lay an Adequate Foundation

¶ 52         Expert testimony is admissible if the proffered expert is qualified, a foundation is laid
establishing a basis for the expert's opinions, and the testimony would assist the trier of fact in
understanding the evidence. *Todd W. Musburger, Ltd. v. Meier*, 394 Ill. App. 3d 781, 800
(2009). First, the expert must be found qualified to testify as an expert witness. "Expert
testimony is admissible if the proffered expert is qualified by knowledge, skill, experience,
training, or education, and the testimony will assist the trier of fact in understanding the
evidence." *Snelson v. Kamm*, 204 Ill. 2d 1, 24 (2003); *Reed v. Jackson Park Hospital
Foundation*, 325 Ill. App. 3d 835, 842 (2001). "The indicia of expertise is not a given level of
academic qualification, but whether the expert has knowledge and experience beyond the
average citizen which would assist the jury in evaluating the evidence." *People v. Sims*, 247 Ill.
App. 3d 670, 675 (1993). "Whether the specialized knowledge is acquired through education,
training, experience, or a combination of each, the witness may testify if he possesses such
knowledge." *Id*. Thus, an expert may be qualified on the basis of experience alone. *Sims*, 247
Ill. App. 3d at 675.

¶ 53         Second, if the expert opinion concerns scientific evidence, there must be a foundation laid
for the scientific principle or methodology used by the expert in arriving at his or her opinion.
Illinois follows the standard under *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923) for the
admission of scientific evidence. See *In re Commitment of Simons*, 213 Ill. 2d 523, 529-31
(2004). In determining whether evidence is scientific, a court looks to the methodology
employed. See *In re Marriage of Alexander*, 368 Ill. App. 3d 192, 197 (2006). The proponent
of evidence subject to the *Frye* test can prove general acceptance through scientific
publications, prior judicial decisions, practical applications, as well as the testimony of
scientists as to the attitudes of their fellow scientists. *People v. McKown*, 226 Ill. 2d 245, 254
(2007) (court may consider cases from Illinois and other jurisdictions as well as technical
writings). No additional inquiry into the validity or reliability of the technique or methodology
is necessary. *In re Commitment of Sandry*, 367 Ill. App. 3d 949, 965-66, 969 (2006) (noting
that Illinois does not follow a " '*Frye*-plus-reliability' test"; once the evidence is admitted,
reliability is assumed). But *Frye* applies only to scientific methodologies that are new or novel.
*People v. McKown*, 226 Ill. 2d 245, 254 (2007). Firearm and toolmark identification is not new
or novel, and Illinois courts have "uniformly" concluded that toolmark and firearms
identification methodology is generally accepted and admissible at trial. *People v. Robinson*,
2013 IL App (1st) 102476, ¶ 91.

¶ 54         Third, all expert testimony, whether scientific or not, must have an adequate foundation in
order to be admissible. " '[T]he admission of an expert's testimony requires the proponent to
lay an adequate foundation establishing that the information upon which the expert bases his
opinion is reliable.' " *People v. Safford*, 392 Ill. App. 3d 212, 221 (2009) (quoting *Hiscott v.
Peters*, 324 Ill. App. 3d 114, 122 (2001), citing *Soto v. Gaytan*, 313 Ill. App. 3d 137, 146

                                                 - 10 -

(2000)). " 'To lay an adequate foundation for expert testimony, it must be shown that the facts or data relied upon by the expert are of a type reasonably relied upon by [experts] in that particular field in forming opinions or inferences.' " *People v. Smith*, 2012 IL App (1st) 102354, ¶ 70 (quoting *People v. Contreras*, 246 Ill. App. 3d 502, 510 (1993)). This foundational requirement is required for the admission of all expert opinions. "It is the function of the trial court to determine whether the foundational requirements have been met." *Safford*, 392 Ill. App. 3d at 221. The issue of the admission of expert testimony is a matter within the sound discretion of the circuit court. *Snelson v. Kamm*, 204 Ill. 2d 1, 24 (2003). " '[E]ven where an abuse of discretion has occurred, it will not warrant reversal of the judgment unless the record indicates the existence of substantial prejudice affecting the outcome of the trial. [Citation.]' " *People v. Jackson*, 232 Ill. 2d 246, 265 (2009) (quoting *In re Leona W.*, 228 Ill. 2d 439, 460 (2008)). This determination is a question of law, which is reviewed *de novo*. *Safford*, 392 Ill. App. 3d at 221.

¶ 55   **B. It Is Inappropriate to Challenge an Expert's Conclusion as Lacking General Acceptance Under *Frye* Where the Expert Employed a Generally Accepted Methodology But His Opinion Lacked Foundation; the Appropriate Challenge Is to Foundation**

¶ 56   In this case, Barr was qualified as an expert witness, without objection, and so Barr's qualification as an expert witness is not at issue.

¶ 57   Defendant argues that Barr's opinion lacked adequate foundation where he "did not testify to the specifics of the striations that he used to come to his conclusion," and that the identification procedure testified to and used by Barr in this case "calls into question whether his identification procedure would be generally accepted in the relevant scientific and legal communities." As part of defendant's argument that Barr's testimony lacked foundation, defendant also argues in his brief on appeal that firearm/toolmark identification is not "scientific." Defendant argues that "[f]or the past eighty-plus years, the Illinois courts have assumed that the firearms identification technique used by the Illinois State Police (and other police departments) is a scientific method utilizing accepted standards in the particular field for judging the degree of confidence in the expert's conclusion." Defendant relies on a report issued in February 2009 by the National Academy of Sciences, authored by its Committee on Identifying the Needs of the Forensic Science Community of the National Research Council entitled "Strengthening Forensic Science in the United States: A Path Forward" (2009) (NRC Report).[3] Relying on the NRC Report, defendant further argues that "[a]s it stands today, firearms identification is 'scientific' only to the extent that it is performed by individuals employed as forensic scientists."

¶ 58   Defendant thus takes issue with whether Barr's methodology in this case is "generally accepted" and also takes issue with the scientific methodology of firearm/toolmark identification itself and disputes its reliability, as well as challenging the foundation of Barr's ultimate expert opinion.

¶ 59   While it is tempting to think of these types of arguments as a *Frye* question, *Frye* is only for new or novel scientific methodologies. There is nothing new or novel about using a

---

[3]The NRC Report is available at https://www.ncjrs.gov/pdffiles1/nik/grants/228091.pdf.

comparison microscope to compare two bullets for firearm/toolmark comparison and identification. To the extent defendant urges us to declare this particular expert's testimony with zero individual factors identified by his firearm/toolmark comparison as a new or novel science or lacking general acceptance, we decline. This expert's zero-based testimony was the result of either the shortcut direct examination by the State or poor testimony by the expert, which failed to lay an adequate foundation. Litigants have attempted to attack expert opinion testimony on the ground that the basis is not reasonably relied upon by experts in the field or lacks general acceptance, under a *Frye*-type challenge. But the Illinois Supreme Court has "reiterate[d] that a *Frye* admissibility challenge is not the proper vehicle to question the conclusions an examiner reaches in a particular case." *People v. Luna*, 2013 IL App (1st) 072253, ¶ 72. The appropriate challenge is to foundation, which was the objection made by defendant at trial.

¶ 60                   C. We Will Not Consider Forfeited Objection or Issues
                           or Evidence That Was Not Introduced at Trial

¶ 61       Further, objections regarding Barr's particular methodology in this case and regarding the general acceptance of the methodology of firearm/toolmark identification itself were not made at trial. Defendant objected only on the basis of "foundation *** based on *Safford* [(*People v. Safford*, 392 Ill. App. 3d 212 (2009))] in that we don't believe that a foundation has been properly laid or discovery properly given as to the specifics of the striations that this examiner used to come to his conclusion." We do not read this specific objection to include a further *Frye* objection to Barr's specific methodology lacking general acceptance or to the general acceptance of the general methodology employed in firearm/toolmark identification. Though defendant urged us to consider these arguments at oral argument of this case, such objections were not made below at trial and thus these arguments were forfeited, as defendant recognized at oral argument. Any objection to Barr's methodology as being new or novel or not being generally accepted under *Frye* was forfeited and we will not consider such argument. See *People v. Enoch*, 122 Ill. 2d 176, 186-87 (1988); *People v. Nieves*, 192 Ill. 2d 487, 503 (2000); Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008).

¶ 62       We also disagree with the dissent's speculations about the strength of Barr's opinion based on the alleged fact that the defense inadvertently included a copy of an expert report it did not use at trial. We note defendant's concern at oral argument with unconstitutional burden-shifting. This expert opinion was not admitted at trial and is not part of the record of the official proceedings at trial. This court will not consider evidence that is not part of the trial record or presented to the trial judge. See *Ruiz v. Walker*, 386 Ill. App. 3d 1080, 1081 (2008). See also *People v. Williams*, 200 Ill. App. 3d 503, 513 (1990) (police laboratory report could not be considered on appeal in a supplemental record where that evidence was not admitted into evidence at trial). The report is not part of the trial record and has no bearing on the adequacy on the foundation of Barr's expert opinion. We therefore do not rely on any mention of this report in our holding.

¶ 63                D. Whether It Is a Hard "Science" or Not, Firearm/Toolmark
Identification Is a Useful Forensic Aid and the Methodology in
Firearm/Toolmark Identification Has Long Been,
and Continues to Be, Generally Accepted in Illinois

¶ 64       "The determination of the reliability of an expert's methodology is naturally subsumed by the inquiry into whether it is generally accepted in the scientific community." *People v. Nelson*, 235 Ill. 2d 386, 431 (2009) (citing *Donaldson v. Central Illinois Public Service Co.*, 199 Ill. 2d 63, 80-81 (2002)). A particular methodology is generally accepted if "the underlying method used to generate an expert's opinion is reasonably relied upon by experts in the relevant field." *In re Commitment of Simons*, 213 Ill. 2d 523, 530 (2004).

¶ 65       As to the methodology itself, Illinois has long recognized the admissibility of firearm/toolmark comparison and identification. See *People v. Fisher*, 340 Ill. 216, 238-39 (1930) (first admitted firearm/toolmark comparison expert testimony)*; People v. O'Neal*, 118 Ill. App. 2d 116 (1969)*; People v. McKinnie*, 18 Ill. App. 3d 1012 (1974)*; People v. Miller*, 31 Ill. App. 3d 436, 446-47 (1975); *People v. Singletary*, 73 Ill. App. 3d 239, 248-49 (1979). We have recently reiterated that expert firearm/toolmark identification testimony has been generally admissible in Illinois courts for decades and there is no split of authority in Illinois on this issue. *Robinson*, 2013 IL App (1st) 102476, ¶ 80.

¶ 66       We have further specifically reiterated that we will continue to analyze firearm/toolmark comparison and identification expert testimony as one involving scientific evidence. See *Robinson*, 2013 IL App (1st) 102476, ¶ 67. In *Robinson*, we held that while "federal and state courts have had occasion to revisit the admission of expert testimony based on toolmark and firearms identification methodology," the courts have "uniformly" concluded that toolmark and firearms identification methodology is generally accepted and admissible at trial. *Robinson*, 2013 IL App (1st) 102476, ¶ 91.

¶ 67       The NRC Report relied upon by defendant to challenge the discipline of firearm/toolmark identification was authorized by Congress and summarizes the state of forensic science in the United States. The report includes a helpful description of how toolmarks are created, which aids our analysis and is helpful in explaining this forensic discipline. "Toolmarks are generated when a hard object (tool) comes into contact with a relatively softer object." NRC Report, *supra* at 150. Toolmarks associated with a firearm may occur in the commission of a crime when "the internal parts of a firearm make contact with the brass and lead [or other materials] that comprise ammunition." *Id*. "The manufacture and use of firearms produces an extensive set of specialized toolmarks." *Id*. at 150-51.

¶ 68       The NRC Report was critical of all disciplines in forensic science as generally not being "scientific" enough, except DNA analysis. The NRC Report states:

         "With the exception of nuclear DNA analysis, however, no forensic method has been rigorously shown to have the capacity to consistently, and with a high degree of certainty, demonstrate a connection between evidence and a specific individual or source." NRC Report, *supra*, at 7.

¶ 69       The NRC Report goes on to further explain:

         "In terms of scientific basis, the analytically based disciplines generally hold a notable edge over disciplines based on expert interpretation. But there are important variations among the disciplines relying on expert interpretation. For example, there are more

- 13 -

established protocols and available research for fingerprint analysis than for the analysis of bite marks. There also are significant variations within each discipline. For example, not all fingerprint evidence is equally good, because the true value of the evidence is determined by the quality of the latent fingerprint image. These disparities between and within the forensic science disciplines highlight a major problem in the forensic science community: The simple reality is that the interpretation of forensic evidence is not always based on scientific studies to determine its validity. This is a serious problem." NRC Report, *supra*, at 7-8.

¶ 70    The NRC Report's critique of firearm/toolmark identification specifically was that "the final determination of a match is always done through direct physical comparison of the evidence by a firearms examiner, not the computer analysis of images," and the examiner makes "a subjective decision based on unarticulated standards and no statistical foundation for estimation of error rates." NRC Report, *supra*, at 153-54. Thus, the National Academy of Sciences committee feels that human expert interpretations not based on strictly "scientific" studies and "computer analysis" to establish their validity pose a "serious problem."

¶ 71    We note that defendants in other reported cases have also relied on the NRC Report in an attempt to undermine the legitimacy of firearm/toolmark examination in criminal cases and reverse convictions against them based on such evidence. See *Robinson*, 2013 IL App (1st) 102476, ¶ 90. But to argue that forensic evidence must have the certainty of a laboratory test or computer analysis and results that are independent of any human interpretation such as DNA evidence in order to be admissible as "scientific" would wipe out the majority of forensic evidence except DNA and perhaps tests for blood typing and tests for the presence or absence of gun powder residue.

¶ 72    The reality in forensic science and its application to criminal cases and our justice system is that these human expert interpretations are highly probative and aid triers of fact and the police in not only convicting but also excluding suspects as perpetrators of crimes. The types of forensic trace evidence comparison methods that are admissible in Illinois are varied and include, for example, handwriting comparison, blood spatter analysis, bitemark identification, shoe and tire impressions, fingerprints, gunshot residue and patterns, forensic botany (analysis of plant material found in connection with a crime), forensic pathology, paint analysis, and hair and fiber comparison. See, *e.g.*, *People v. Knox*, 121 Ill. App. 3d 579, 583-84 (1984) (first Illinois case admitting expert testimony regarding blood spatter evidence; held the record established an adequate foundation for such expert testimony and that the technique used by the officer is essentially one of pattern recognition and reconstruction, rejecting the defendant's argument that this area of expertise requires substantial training in physics); *People v. Davis*, 304 Ill. App. 3d 427, 437 (1999) (holding that the method employed to identify lip prints, a side-by-side comparison, is reliable where the experts testified that the method they employed to identify the lip print was the same as the well-accepted method of fingerprint identification, which is accepted by the forensic science community, the FBI, and the Illinois State Police); *People v. Shaw*, 278 Ill. App. 3d 939, 948 (1996) ("Because of the unique quality of an individual's dentition, testimony concerning bite mark identification is admissible in Illinois."); *People v. Mackins*, 17 Ill. App. 3d 24, 38 (1974) (affirmed admission of expert opinion evidence regarding scientific analysis of paint samples and of fibers found on defendants' clothing and fibers found on victim's clothing in accordance with morphological characteristics). These pieces of forensic evidence have proven capable of comparison and

identification to specific individuals or sources, even though they do involve human analysis by experts and, necessarily, some subjective interpretation, and have long been upheld as admissible where the expert lays a proper foundation concerning the bases for his or her opinion.

¶ 73    To the extent that the NRC Report questions the "scientific" basis for firearm/toolmark identification, it may indeed be more appropriate to view the discipline of firearm/toolmark identification as one that is forensic, mechanical or technical and specialized, yet still requiring expert testimony, instead of being deemed a "science." The fact that this field has been termed a science may be more a reflection of antiquated notions of anything new and novel as a "science." But if it is true that the discipline of firearm/toolmark examination is not "scientific," all that would mean is that any expert opinion in this area is not subject to the *Frye* admissibility standard in the first place. See *People v. Shinohara*, 375 Ill. App. 3d 85, 111 (2007) (holding that if an expert's opinion is derived solely from his or her observations and experiences, the opinion is generally not considered to be scientific evidence for purposes of the *Frye* standard of admissibility; on the other hand, if the expert's opinion is derived from a the scientific method or particular scientific methodology, such as the application of scientific principles or the use of other literature or studies, then the opinion is generally considered scientific). Such expert opinions would still, however, be admissible through general expert testimony, subject to the general foundation requirements as a safeguard.

¶ 74    The NRC Report does not change the long-standing fundamental recognition in Illinois that the facts relied upon by experts in toolmark and firearm comparison are of a type reasonably relied upon by experts in the field in order to establish a proper foundation. Questioning whether the discipline of firearm/toolmark examination is deemed a strict "science" or not does not diminish its value, nor does it overturn Illinois's long-standing acceptance of the facts relied upon by such experts as facts that are reasonably relied upon in this discipline.

¶ 75    The NRC Report provides no basis for any change in Illinois law. We have held that "[i]t is not the purview of the courts to exclude entire fields of study from the general acceptance test because those sciences are 'softer,' while allowing experts in those fields to present opinions that create a perception of scientific certainty. Creating these exceptions opens the justice system to abuse." *In re Detention of New*, 2013 IL App (1st) 111556, ¶ 57, *aff'd*, 2014 IL 116306. Our jurisprudence and justice system continue to contain safeguards, including the role of the trial court in determining whether foundational requirements for the expert opinion are met, as well as the defense's opportunity to vigorously cross-examine the experts.

¶ 76                        E. Foundation for an Expert's Opinion Testimony Is
                    Necessary for Admission; Foundation Is Not an Issue
                    Regarding Merely the Weight of the Testimony

¶ 77    Nevertheless, the fact that the methodology of firearm/toolmark identification is generally accepted, and that Barr testified to how he followed the methodology, does not remove the further requirement of laying a proper foundation for the expert opinion. We reiterate that the issue is not the foundation for qualifying Barr to testify as an expert witness or even the foundation he laid for his methodology but, rather, the foundation for his subsequent expert opinion testimony. The question is whether Barr's testimony meets foundational requirements for the admission of expert testimony generally. The proponent must " 'lay an adequate

foundation establishing that *the information upon which the expert bases his opinion is reliable*.' " (Emphasis added.) *Safford*, 392 Ill. App. 3d at 221 (quotin*g Peters*, 324 Ill. App. 3d at 122, citin*g Soto*, 313 Ill. App. 3d at 146). Part of the general foundation requirement for expert testimony is that " 'it must be shown that the facts or data relied upon by the expert are of a type reasonably relied upon by [experts] in that particular field in forming opinions or inferences.' " *People v. Smith*, 2012 IL App (1st) 102354, ¶ 70 (quoting *People v. Contreras*, 246 Ill. App. 3d 502, 510 (1993)). This foundational requirement is a prerequisite for all expert opinions, whether deemed "scientific" or not. This is an admissibility issue, not merely weight. Only after a proper foundation has been laid does the expert's testimony become a matter of weight to be assigned by the jury. "*After* proper foundation has been laid, 'the weight to be assigned to that testimony is for the jury to determine.' " (Emphasis added.) *Baley v. Federal Signal Corp.,* 2012 IL App (1st) 093312, ¶ 74 (quotin*g Fronabarger v. Burns*, 385 Ill. App. 3d 560, 565 (2008)). The concern is whether the defendant's right to a fair trial was impacted by the admission of an expert's testimony that lacked foundation. *Safford*, 392 Ill. App. 3d at 223 (citing *People v. Brown*, 57 Ill. App. 3d 528, 531 (1978)).

¶ 78                   F. "Take My Word For It" or "Trust Me" Is Not Enough:
                   Barr Did Not Lay an Adequate Foundation for His Expert
                 Opinion That the Bullet Recovered From the Victim Matched
                 Defendant's Gun Where He Did Not Testify to *Any* Individual
                   Characteristics of the Firearm and the Bullet or Give Any
                   Reason for His Expert Opinion That There Was a Match

¶ 79        Barr did not point to any information upon which he based his opinion that the recovered bullet matched defendant's gun. Class and individual striations and unique toolmarks constitute the information of a type reasonably relied upon by experts in the field of firearm/toolmark comparison. Barr explained that class characteristics result from the design of a firearm prior to manufacture and include the rifling of the inside of the barrel of the gun, while individual characteristics "are the irregularities or imperfections that are caused by the manufacturing process due to use or abuse of the tool." Barr testified that a particular firearm will have its own set of individual characteristics that set it apart from other firearms. Yet, Barr testified that "[t]he basis for an identification is sufficient agreement of class and individual characteristics." Barr testified, "We don't really count the number of lines or how many things are in agreement, but it is an overall pattern based on class and individual characteristics."

¶ 80        But Barr only testified to the class characteristics of defendant's gun, a Grendel .38-caliber pistol, which was six striations to the right. Barr did not testify to any individual characteristics of defendant's gun. In addition, Barr did not testify to any characteristics of the bullet recovered from Ivory, either class characteristics or individual characteristics. Barr was asked about the individual characteristics of the bullet recovered from Ivory, "Were you able to determine the individual characteristics of that bullet?" Barr replied, "Could you be a little more specific as to what you mean by that?" The prosecutor then stated, "We will come back to the bullet," but never did. Barr testified that he determined that the firearm and the recovered bullet were "of the same class characteristics," but did not testify to any individual characteristics and the prosecutor never returned to the line of questioning regarding the individual characteristics of the recovered bullet. Barr did not testify to even a single individual

characteristic or striation or marking as a point of comparison on the bullet recovered from Ivory to the test bullets fired from defendant's gun. He did not testify to even one. Barr merely testified that there was "sufficient agreement" between the bullet and defendant's gun, and did not point to even a single piece of information to explain. When asked specifically about the striations on the recovered bullet, Barr testified, "They don't all have to line up if that is what you are asking. We are looking for an agreement, and there is no set number." Even upon vigorous cross-examination, Barr's testimony focused on the "sufficient agreement" standard and the fact that under this standard there is no requirement for a minimum number of striation matches but, again, he did not testify to any specific markings or individual characteristics for comparison. Barr gave no reason at all to support his expert opinion that there was sufficient agreement and a match between the bullet recovered by the victim and defendant's gun.

¶ 81    This case is indeed markedly similar to *Safford*, as defendant argues. Although *Safford* was a fingerprint case, the comparison of unique points and marking is similar to the comparison in firearm/toolmark identification. In *Safford*, no points of comparison were ever identified by the fingerprint expert and there was no testimony by the expert as to how he arrived at his conclusion that the latent palm print matched defendant's palm print. *Safford*, 392 Ill. App. 3d at 221. We therefore agreed with the defendant's argument that the expert's testimony amounted to no more than " 'take my word for it.' " *Safford*, 392 Ill. App. 3d at 224. We held that absent any explanation that established the legal foundation for the expert's ultimate opinion, the admission of his opinion was reversible error. *Safford*, 392 Ill. App. 3d at 228, 230-31. We further held that "[w]hile the paucity of points of similarity may go to the weight of the evidence rather than admissibility [citation], as the paucity approaches zero, our concern is no longer with weight but with admissibility." *Safford*, 392 Ill. App. 3d at 225.

¶ 82    Here, just as in *Safford*, that is precisely the number of points of comparison we have: zero. In this case, there literally was *no* foundation for Barr's expert opinion testimony, just as in *Safford*, where no points of comparison were ever identified.

¶ 83    The State argues that this case is distinguishable from *Safford* where Barr "testified to the exact basis of his opinion, which was 'sufficient agreement.' " But "sufficient agreement" is the generally accepted standard and constituted Barr's ultimate opinion.[4] "Sufficient agreement" is not the factual basis of the opinion. There is nothing "exact" about merely concluding there was "sufficient agreement" without any explanation of any facts leading to that conclusion.

¶ 84    The State also argues that this case is distinguishable from *Safford*, where defense counsel conducted a lengthy cross-examination and that "[i]f anything, defendant here benefitted from any lack of specificity in Barr's testimony, shaping his cross-examination to portray the 'sufficient agreement' standard as sloppy, subjective, and unscientific." We disagree that defendant benefitted in any way from Barr's lack of foundation for his opinion. As we noted in *Safford*, expert testimony where no explanation is provided for how the expert reached his or

---

[4]We note that the generally accepted standard of "sufficient agreement" testified to by Barr is the same as the theory of identification promulgated by the Association of Firearms and Tool Mark Examiners (AFTE): "sufficient agreement." See AFTE Criteria for Identification Committee, *The Theory of Identification, Range of Striae Comparison Reports and Modified Glossary Definitions–An AFTE Criteria for Identification Committee Report*, 24 AFTE J. 337 (Apr. 1992). But because Barr did not specifically identify the AFTE theory as the standard he followed we do not rely on it.

her opinion deprives the defendant of any meaningful means to challenge the conclusion of the expert on cross-examination:

> "Our problem with the expert testimony here is that [the expert] claimed to base his opinion 'upon facts personally known to him, [but] he [was unable to] testify to those facts.' [Citation.] That vigorous cross-examination occurred as to the absence of details is hardly an adequate test of the substance of [the expert's] opinion." *Safford*, 392 Ill. App. 3d at 227.

¶ 85    The State further argues that "the validity of *Safford* has been questioned recently, including by this Court in *People v. Negron*, 2012 IL App (1st) 101194." The State misapprehends both our holding in *Negron* and the factual similarity between this case and *Safford* and its dissimilarity to *Negron*. In *Negron*, we held that *Safford* is an "outlier" case factually (*People v. Negron*, 2012 IL App (1st) 101194, ¶ 41) because the expert in *Safford* did not testify to *any* points of comparison and also did not explain how he arrived at his expert conclusion, which is a rare circumstance. Over the years, most firearm/toolmark expert opinion cases involve some number of points of comparison and also detail any unique toolmarks. See, *e.g.*, *People v. Miller*, 31 Ill. App. 3d 436, 446-47 (1975) (expert testified that the evidence bullet and two other bullets test-fired from the weapon all had identical class characteristics of six lines and grooves twisting to the right, as well as identical individual markings caused by imperfections in the weapon's barrel). There have not been many cases reversing the admission of an expert firearm/toolmark examiner's expert opinion for lack of foundation. See *People v. Berkman*, 307 Ill. 492, 500-01 (1923) (holding a proper foundation had not been laid for the ballistics expert's opinion due to a lack of testimony as to facts pertaining to the particular rifling of the gun that made the peculiar marks on the fired bullet).

¶ 86    Consistent with *Safford*, in *Negron* we specifically noted not only that *Safford* is an outlier case factually but we also noted that "no reported case since [*Safford*] has held that there must be a minimum number of points of fingerprint comparison or a disclosure of a specific number of points of similarity found by the expert." *Negron*, 2012 IL App (1st) 101194, ¶ 41. But our holding in *Negron* does not stand for the proposition that an expert's opinion is admissible where he or she does not testify to *any* points of comparison or any reason for his expert opinion.

¶ 87    In *Negron*, the expert not only generally explained the process of fingerprint comparison, but he also went into detail about how he compared the defendant's palm print to the recovered latent print at the crime scene and included descriptions of the various minutiae and points he looked for and that in his side-by-side comparison through a magnifying glass he found unique areas in the minutiae that matched. *Negron*, 2012 IL App (1st) 101194, ¶ 37. Thus, the expert in *Negron* described points of minutiae, though not stating an exact number of specific points of comparison, and he detailed how he arrived at his conclusion.

¶ 88    While toolmark and firearm comparison does not require a minimum number of points of comparison, there must be some explanation of the bases for the expert's opinion. We note that, additionally, it may be the better practice for experts to also show a side-by-side photo comparison to aid the trier of fact while explaining the bases for such expert opinions for the jury to be able to weigh this evidence. Regardless, the expert must still testify regarding the bases and reasons for his or her opinion with some actual comparison.

¶ 89    Barr's minimal testimony that he looked at the "overall pattern" and concluded that there was "sufficient agreement" equates to telling the trier of fact "take my word for it." Telling the

jury to "take my word for it" is not enough. There must be some reason given for the expert's opinion. Although we have previously declined to expressly hold that there should be a minimum number of points of comparison, to establish some foundation it is apparent that at least a minimum of *one* point of comparison or marking or other reason for the expert's opinion must be given.

¶ 90 What is at issue is the most basic foundational requirement for the admission of an expert opinion. If there are *no* facts given regarding how the opinion was reached, there effectively cannot be any relevant and probative cross-examination of an expert's reasons and bases for his or her opinion, and the burden is indeed shifted entirely to the defense, as defense counsel maintained at oral argument. Foundation as a gatekeeping requirement would be rendered a nullity.

¶ 91 The State relies on *People v. O'Neal*, 118 Ill. App. 2d 116 (1969), arguing that there the court held that the testimony of the ballistics expert witness was properly admitted in evidence, even though there was no factual basis in the evidence to support his conclusion and no description of any particular points of similarity. In both *Safford* and *O'Neal* the experts did not identify any specific points of comparison they relied upon in reaching their opinions. See *Safford*, 392 Ill. App. 3d at 221; *O'Neal*, 118 Ill. App. 2d at 122. The difference between *O'Neal* and *Safford* is that in *Safford* the expert also did not provide any testimony concerning the methodology of how he conducted the examination and comparison of the fingerprints in that case and he made no notes that said how he reached his opinion (*Safford*, 392 Ill. App. 3d at 221), whereas in *O'Neal* the expert did testify to the procedure he used in that case to make his comparison, using a comparison side-by-side microscope and an optical bridge and looking at the bullets side-by-side at the "small microscopic imperfections made in the bore of the gun" (*O'Neal*, 118 Ill. App. 2d at 121-22).

¶ 92 Similar to *O'Neal*, Barr did at least testify to the methodology of how he conducted the particular examination of the bullet and cartridge casings in this case, testifying that he used a comparison microscope with two stages and that, through the oculars, he looked for the "overall pattern" that is "based on class and individual characteristics." We note that although *O'Neal* has not been reversed, it is a 1969 case and has been cited only four times (other than the discussion in *Safford*), and not for the particular proposition at issue here, that expert opinions completely devoid of any testimony regarding any markings in firearm/toolmark identification have sufficient foundation. See *People v. Johnson*, 11 Ill. App. 3d 745, 749 (1973); *People v. Edgeworth*, 30 Ill. App. 3d 289, 301 (1975); *People v. Driver*, 62 Ill. App. 3d 847, 853 (1978). The only case citing *O'Neal* for this particular proposition is *People v. Miller*, 31 Ill. App. 3d 436 (1975), but the expert in that case testified to the class characteristics in his identification between the recovered evidence bullets and the firearm. See *Miller*, 31 Ill. App. 3d at 447 ("Here the test bullets were offered in evidence and although the expert did not describe the details of the individual markings caused by imperfections in the gun's barrel, he did describe the class characteristics."). Here, Barr only testified to the class characteristics of defendant's firearm as observed from the test bullets. Barr did not testify as to any class characteristics on the recovered bullet or how it matched defendant's gun, as did the expert in *Miller*. *Miller* also is nearly 40 years old and has also not been recently relied upon in any recent reported precedent for this proposition. This leaves *no* reported case other than *O'Neal* where a firearm/toolmark identification expert's testimony was found to have sufficient

foundation where the expert did not testify to even a single individual marking on the actual recovered bullets from the crime that led to his conclusion.

¶ 93    We acknowledge that *Safford* noted that *O'Neal* was not "at odds" with the holding in *Safford*, but *Safford* noted that the ground of the challenge to the expert's testimony was different where "[t]he defendant in *O'Neal* did not argue that the jury was being asked by the expert to 'take his word for it,' " as the defendant in *Safford* claimed. *Safford*, 392 Ill. App. 3d at 227. Instead, the defendant in *O'Neal* had argued that " 'either the test bullets, photomicrographs, or an explanation of the particular similarities should have been offered into evidence; and that as a result defendant's right to proper cross-examination was improperly restricted.' " *Safford*, 392 Ill. App. 3d at 227 (quoting *O'Neal*, 118 Ill. App. 2d at 122-23). On the other hand, the defendant in *Safford* was challenging the admission of the expert's testimony on the ground that the expert provided no supporting facts for his opinion and based his opinion " 'upon facts personally known to him,' " which even *O'Neal* held is impermissible. *Safford*, 392 Ill. App. 3d at 227 (quoting *O'Neal*, 118 Ill. App. 2d at 123). This is the same challenge being made by defendant here in this case as well.

¶ 94    Upon a close reading of *O'Neal*, we believe that while the law was correctly stated, the application of the law to the facts was inconsistent, as the expert in *O'Neal* did not testify to those facts personally known to him regarding the factual basis of his expert opinion but, rather, only to the methodology he employed and his ultimate opinion. To the extent that *O'Neal* would allow admission of expert opinion testimony of an identification by firearm/toolmark examination experts based solely on testimony as to the methodology and examination procedure they used, without laying any foundation as to any facts they observed that led to their expert conclusion of a match we do not follow it, as we hold that such testimony does not satisfy the foundation requirement. " '[T]he admission of an expert's testimony requires the proponent to lay an adequate foundation establishing that the *information* upon which the expert bases his opinion is reliable.' " (Emphasis added.) *Safford*, 392 Ill. App. 3d at 221 (quoting *Hiscott*, 324 Ill. App. 3d at 122, citing *Soto*, 313 Ill. App. 3d at 146). " 'An expert's opinion is only as valid as the basis and reason for the opinion.' " *People v. Wright*, 2012 IL App (1st) 073106, ¶ 127 (quoting *Wilson v. Bell Fuels, Inc.*, 214 Ill. App. 3d 868, 875 (1991)). Testifying to the method of examination used and what the expert is looking for establishes only what the expert *did*; it does not establish any information as to what the expert actually *found* and does not provide any information for the bases and reasons for his or her ultimate opinion. An expert must give *some* reason for his or her opinion.

¶ 95              G. The Error in Admitting Barr's Testimony Was Not Harmless,
                   as It Placed the Murder Weapon in Defendant's Hands

¶ 96    The State's last argument is that even if Barr's testimony was improperly admitted, this error was harmless because defendant was not prejudiced and the State offered "significant other evidence of defendant's guilt." To establish that an error was harmless the "State must prove beyond a reasonable doubt that the jury verdict would have been the same absent the error." *People v. Thurow*, 203 Ill. 2d 352, 363 (2003). When deciding whether error is harmless, a reviewing court may: (1) focus on the error to determine whether it might have contributed to the conviction; (2) examine the other properly admitted evidence to determine whether it overwhelmingly supports the conviction; or (3) determine whether the improperly

admitted evidence is merely cumulative or duplicates properly admitted evidence. *In re Rolandis G.*, 232 Ill. 2d 13, 43 (2008).

¶ 97 We hold the State has failed to carry its burden of showing beyond a reasonable doubt that the jury's verdict would have been the same without Barr's testimony. There were no eyewitnesses in this case. The testimony of Danies and Stanley merely established that defendant changed his jacket the day of the murder but Stanley did not think this was unusual because it was raining. We also do not find this unusual or probative. Further, defendant's own statement in the videotape of the police interrogation was consistent with what he told the victim's family, that he was with Ivory when two individuals who were selling drugs attempted to rob Ivory and one of them shot Ivory. Defendant had told Danies and Stanley before the shooting that he was "going to put this thing up," which Stanley took to mean he would put his gun away. While the State attempted to portray robbery as a motive for defendant to kill Ivory, and Pettis testified that defendant told him that he took money from Ivory's pocket after he checked to see if Ivory was still alive, $20 was found on Ivory at the medical examiner's office. In his taped interview with Detectives Halloran and Gorman, defendant denied that he had a weapon at the time Ivory was shot and denied shooting Ivory the night of September 12 and told the detectives he had no reason to shoot Ivory. Defendant's jacket was inventoried but was never sent for testing for gunpowder residue. The State concedes, "[i]t is correct that Barr's testimony placed the murder weapon in defendant's hands and demonstrated that the shot that killed Anderson came from defendant's gun."

¶ 98 Other than perhaps DNA evidence, we can think of no evidence more prejudicial than evidence literally placing the murder weapon in a defendant's hands. Here, the jury asked to view the videotape of defendant's statement to the police. This indicates that the jury was seriously weighing the evidence and had doubt about the State's case. Barr's opinion as a ballistics/toolmark expert was a critical piece of evidence in this case. The importance of presenting such a "match" to the jury could have overshadowed all the other evidence. The erroneous admission of Barr's foundationless expert opinion caused substantial prejudice and thus denied defendant a fair trial. See *People v. Howard*, 305 Ill. App. 3d 300, 309 (1999) (holding that the trial court's error in admitting the expert testimony caused substantial prejudice to the defendant and denied him a fair trial).

¶ 99 We believe that the trial court abused its discretion in admitting the opinion testimony of Barr. We further conclude that the trial court's error in admitting the expert testimony caused substantial prejudice to the defendant and denied him a fair trial. We therefore reverse the defendant's conviction and remand the cause for a new trial.

¶ 100 II. Sufficiency of the Evidence

¶ 101 Defendant next argues that his guilt of the offense of first-degree murder was not proven beyond a reasonable doubt, specifically arguing that the "State's case rested on a questionable firearms identification between a single bullet and [defendant's] handgun, circumstantial evidence, and the somewhat varied statements which [defendant] made regarding the shooting."

¶ 102 Because the error in admitting the expert opinion requires that his conviction be reversed and the cause remanded for a new trial, we hold that the evidence submitted at trial was sufficient for a jury to reach a verdict that defendant was guilty beyond a reasonable doubt and, thus, in remanding for a new trial based on the erroneous admission of the expert's opinion

testimony, the defendant faces no risk of double jeopardy on retrial. See *People v. Howard*, 305 Ill. App. 3d 300, 309 (1999) (citing *People v. Taylor*, 76 Ill. 2d 289, 309 (1979)). "All evidence submitted at the original trial may be considered in determining the sufficiency question for double jeopardy purposes." *People v. Avery*, 180 Ill. App. 3d 146, 157 (1989) (citing *Lockhart v. Nelson*, 488 U.S. 33 (1988), and *People v. Stofer*, 180 Ill. App. 3d 158 (1989)). "Retrial is permitted even where the evidence remaining after discounting the erroneously admitted evidence is insufficient to sustain a verdict." *Avery*, 180 Ill. App. 3d at 157 (citing *Lockhart*, 488 U.S. 33). Double jeopardy is not a bar where reversal is the result of trial error. *Avery*, 180 Ill. App. 3d at 157 (citing *Burks v. United States*, 437 U.S. 1 (1978)). "A reversal based on trial errors such as the incorrect receipt of evidence implies nothing with respect to defendant's guilt, but merely determines that he was convicted through a judicial process which is defective in some fundamental respect." (Emphasis omitted.) *Avery*, 180 Ill. App. 3d at 157 (citing *Lockhart*, 488 U.S. at 41 n.8, citing *United States v. Tranowski*, 702 F.2d 668 (7th Cir. 1983), and *Taylor*, 76 Ill. 2d 289). Our holding does not constitute any implication as to the defendant's guilt or innocence which would be binding on retrial. *Howard*, 305 Ill. App. 3d at 309 (citing *Taylor*, 76 Ill. 2d at 310).

¶ 103                                  III. Second-Degree-Murder Instruction

¶ 104        Defendant argues that the court also erred in not giving a second-degree-murder instruction, despite defendant's indication at trial that he did not want the instruction, and urges this additional ground for reversal. We disagree, as defendant waived the argument by not including it in his posttrial motion, and the plain error exception to waiver does not apply here because, even if there were any error, such error was invited by defendant where he indicated to the court that he did not want the instruction.

¶ 105        "The purpose of jury instructions is to provide the jury with the correct legal principles applicable to the evidence, so that the jury may reach a correct conclusion according to the law and the evidence." *People v. Bannister*, 232 Ill. 2d 52, 81 (2008). "There must be some evidence in the record to justify an instruction, and it is within the trial court's discretion to determine which issues are raised by the evidence and whether an instruction should be given." *People v. Mohr*, 228 Ill. 2d 53, 65 (2008). But "[t]he question of whether sufficient evidence exists in the record to support the giving of a jury instruction is a question of law subject to *de novo* review." *People v. Washington*, 2012 IL 110283, ¶ 19. "While the giving of jury instructions is generally within the discretion of the trial court, we review *de novo* the question of whether the jury instructions accurately conveyed to the jury the applicable law." *People v. Ingram*, 382 Ill. App. 3d 997, 1007 (2008) (citing *People v. Parker*, 223 Ill. 2d 494, 501 (2006)).

¶ 106        We find first that defendant waived his right to raise the instruction issue by failing to bring his claim of error to the attention of the court in his posttrial motion. It is well recognized that "a defendant forfeits review of any putative jury instruction error if the defendant does not object to the instruction or offer an alternative instruction at trial and does not raise the instruction issue in a posttrial motion." *People v. Herron*, 215 Ill. 2d 167, 175 (2005). Defendant did not include any argument in his posttrial motion that the court erred in not giving a second-degree-murder instruction. Among other arguments, defendant merely included an argument that he was denied a fair trial, without any further specificity. The use of this "boilerplate phrase" of "denial of a fair trial," lacking any specificity, does not preserve a

contention for appeal. *People v. Cook*, 352 Ill. App. 3d 108, 129 (2004) (citing *People v. Willis*, 241 Ill. App. 3d 790, 797 (1992)).

¶ 107    Defendant acknowledges his forfeiture for failing to include the issue in his posttrial motion but invokes the plain-error exception to the forfeiture rule. "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). Plain error allows a reviewing court to address forfeited errors if a clear or obvious error occurred and either: (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error; or (2) the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

¶ 108    But here, even if there was any error, defendant invited the error not just by failing to request it, but by actively refusing a second-degree murder instruction, thereby precluding any plain-error analysis. "Under the doctrine of invited error, an accused may not request to proceed in one manner and then later contend on appeal that the course of action was in error." *People v. Carter*, 208 Ill. 2d 309, 319 (2003). For the doctrine to apply, the defendant must affirmatively request or agree to proceed in a certain way. *People v. Harvey*, 211 Ill. 2d 368, 385 (2004). "Simply stated, a party cannot complain of error which that party induced the court to make or to which that party consented." *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004).

¶ 109    "Invited errors are not subject to plain-error review." *People v. Sanders*, 2012 IL App (1st) 102040, ¶ 30 (citing *People v. Patrick*, 233 Ill. 2d 62, 77 (2009)). As the court in *People v. Johnson*, 2013 IL App (2d) 110535, aptly summarized:

> " '[A] defendant's invitation or agreement to the procedure later challenged on appeal "goes beyond mere waiver." ' *People v. Harvey*, 211 Ill. 2d 368, 385 (2004) (quoting *People v. Villarreal*, 198 Ill. 2d 209, 227 (2001)). Invited error is sometimes referred to as an issue of estoppel in that a defendant may not request to proceed in one manner and later contend on appeal that the course of action was in error. *Harvey*, 211 Ill. 2d at 385. To allow a defendant to use the exact ruling or action procured in the trial court as a vehicle for reversal on appeal would offend notions of fair play, encourage defendants to become duplicitous (*Harvey*, 211 Ill. 2d at 385), and deprive the State of the opportunity to cure the alleged defect (*People v. Bush*, 214 Ill. 2d 318, 332 (2005)). Where the defendant invited the error, our supreme court has declined to address any related plain-error claim. See, *e.g.*, *People v. Patrick*, 233 Ill. 2d 62, 77 (2009)." *Johnson*, 2013 IL App (2d) 110535, ¶ 77.

¶ 110    "The purpose of the invited error doctrine is to prevent a defendant from unfairly receiving a second trial based on an error which he injected into the proceedings." *People v. Smith*, 406 Ill. App. 3d 879, 886-87 (2010) (citing *People v. Pryor*, 372 Ill. App. 3d 422, 432 (2007)).

¶ 111    The record clearly demonstrates that the court specifically explained the second-degree-murder instruction to defendant and asked whether defendant wanted the instruction. The court gave defendant an opportunity to confer with counsel. After doing so, defendant unequivocally indicated he did not want the second-degree murder instruction. See *People v. Coleman*, 347 Ill. App. 3d 266, 273 (2004) (defendant failed to establish entitlement to plain error review of the defendant's argument that he had a substantial right to have the trial

court instruct the jury *sua sponte* over his own objection on the lesser mitigated offense of second degree murder).

¶ 112    Based on this record, defendant clearly invited the error, if there was any. Thus, plain error review is precluded. We caution that defendant may not choose to proceed in one manner at trial, and then contend on appeal that his chosen route was reversible error.

¶ 113                                    CONCLUSION

¶ 114    We agree with defendant's argument that the court erred in allowing the testimony of the State's firearm/toolmark identification expert where the expert's testimony lacked an adequate foundation. We do not, however, hold that the expert's use of the nationally recognized "sufficient agreement" standard is insufficient under *Frye*, because defendant's objection at trial was not based on *Frye* and it is well established that the standard continues to be generally accepted. Rather, the expert's testimony failed the minimum foundational requirements for general expert testimony and should have been excluded. Because the improper admission of the expert's opinion testimony substantially prejudiced defendant, we reverse and remand for a new trial.

¶ 115    Given that our holding regarding the improper admission of the expert's testimony caused substantial prejudice and requires remand for a retrial, we make no holding regarding defendant's sufficiency of the evidence argument.

¶ 116    Finally, we hold that defendant waived any review of his argument that the trial court erred in not giving a second-degree murder instruction where defendant did not raise the issue in his posttrial motion and plain error does not apply because defendant invited any alleged error by indicating at trial that he did not want the instruction.

¶ 117    Reversed and remanded.

¶ 118    JUSTICE MASON, dissenting.

¶ 119    I agree with our observation in *People v. Negron*, 2012 IL App (1st) 101194, ¶ 41, that *People v. Safford*, 392 Ill. App. 3d 212 (2009), is indeed an "outlier case" and that "no reported case since then" has followed its reasoning. I do not believe this case should be the first to do so and for that reason, I respectfully dissent. Because any deficiencies in Barr's testimony affected its weight and not its admissibility and because the jury, as the trier of fact, was entitled to accept Barr's opinion along with the other evidence in this case, I would affirm Jones's conviction.

¶ 120    Jones concedes, as he must, that Illinois courts have accepted opinion testimony from ballistics experts for decades. See *People v. Fisher*, 340 Ill. 216, 238-39 (1930). Jones does not contest that Barr was qualified by education, training and experience to render an opinion in the field of ballistic firearms identification. Indeed, Barr was accepted as an expert without objection. Jones further does not dispute that the methods Barr used to make the comparisons between the bullet recovered from under Ivory Anderson's body and the fired cartridge from the weapon owned by Jones were typical of those used by firearms identification experts and were sufficient to enable Barr to reach an opinion. He does not suggest that Barr did not, in fact, engage in the analysis he testified to. Jones admits that Barr reviewed his findings with a colleague who agreed with Barr's opinion (although Jones questions the colleague's

objectivity). Jones further insisted prior to trial and the trial court agreed that Barr should not be permitted to lend weight to his subjective opinion by testifying to a reasonable degree of "scientific" or "ballistics" certainty. Jones's only claim is that Barr's failure to specifically identify the "sufficient areas of agreement" between the recovered and test-fired bullets renders Barr's opinion inadmissible as lacking an adequate foundation.

¶ 121 First, as a threshold matter, the record does not permit us to conclude that identification of the particular areas of a match between a recovered bullet and a test-fired bullet is standard in the firearms identification field, a conclusion that is necessary before we can find that Barr's testimony was deficient because it lacked this detail. Barr's testimony establishes that such an analysis is not used in the Illinois State Police laboratory and Barr was unaware of any other firearms experts who "count lines" or the number of striations or scratch marks on bullets in order to make an identification. Authorities in the field confirm this. The standard utilized by Barr–sufficient areas of agreement–is the standard adopted by the Association of Firearms and Toolmark Examiners. See *The Theory of Identification, Range of Striae Comparison Reports and Modified Glossary Definitions–An AFTE Criteria for Identification Committee Report*, 24 AFTE J. 336-40 (Apr. 1992). No reported authority–from courts, scholars or technical writers in the field–has recognized counting lines or scratch marks as a component of a valid opinion regarding the identification of a particular firearm as the source of a fired bullet. See Ronald Nichols, *The Scientific Foundations of Firearms and Tool Mark Identification–A Response to Recent Challenges*, available at http://www.afte.org/announcements/critrevnichols.htm (last visited Mar. 17, 2015); see also *United States v. Glynn*, 578 F. Supp. 2d 567, 574 (S.D.N.Y. 2008) ("[W]hereas both a ballistics examiner and a fingerprint examiner are ultimately called upon to make a subjective judgment of whether the agreement between two pieces of evidence is 'sufficient' to constitute a 'match,' a fingerprint examiner may not declare a match unless a pre-specified number of 'points' of similarity exist between the two samples [citations]. Although attempts [have] been made to introduce similar minimum standards and 'protocols' into ballistics analysis, such attempts have not yet met with general acceptance ***."). Thus, the majority seeks to impose on this field a numerical or quantitative standard not ever recognized to be relevant or required. Because Jones cannot demonstrate that Barr's opinion was at variance with long accepted standards in the field, his challenge to its admissibility on this basis must fail.

¶ 122 Second, it is not the *foundation* for Barr's opinion that Jones challenges; it is the *specificity* of Barr's expression of his opinion that forms the crux of Jones' arguments. Once the State established Barr's qualifications, the methods he used to compare the bullets and the fact that those methods were typical of those used by Barr and others in the field, the foundation was laid. And if the State, after laying a foundation, chose to elicit in summary fashion Barr's opinion that the bullets matched and both were fired from the weapon owned by Jones, that decision does not operate to retroactively eliminate the foundation for the opinion already established. It certainly renders the opinion weaker, a point defense counsel emphasized in both cross-examination and closing argument, but it does not render it inadmissible.

¶ 123 The argument raised by Jones here is identical to that raised and rejected decades ago in *People v. O'Neal*, 118 Ill. App. 2d 116 (1969). Like Jones, the defendant in *O'Neal* conceded the witness's expertise in the field of firearms identification and that a properly qualified expert may render an opinion as to whether a bullet recovered from a crime scene was fired from a particular weapon. As described by the court, "defendant argues that in the instant case

- 25 -

there was *no factual basis in the evidence* to support the expert's conclusions that the basis of his opinion was not placed before the jury, that either the test bullets, photomicrographs, or *an explanation of the particular similarities should have been offered into evidence*; and that as a result defendant's right to proper cross-examination was improperly restricted." (Emphases added.) *Id*. at 122-23. Finding that the expert's testimony was properly admitted, the court observed:

> "The witness testified that he received the gun and bullet in question at the laboratory; and the gun and bullet were introduced into evidence. He also testified that he fired the gun twice, and that he compared the test bullets with the one in question. He testified to the procedure generally used and to the reasons why a comparison of bullets will reveal the identity of the gun which fired them. On the basis of these tests, he was of the opinion that the gun found on defendant's person fired the bullet found in the complaining witness's coat. The expert witness set forth the reasons for his conclusion, and it was for the triers of fact to determine how much weight to give to his testimony. It should also be noted that the bullet and gun in question were introduced into evidence, and that defendant was not foreclosed from conducting similar tests, either prior to or during trial." *Id.* at 123-24.

No reported case in Illinois since *O'Neal* has reached the opposite result with respect to testimony from a firearms identification expert. See *People v. Miller*, 31 Ill. App. 3d 436, 446-47 (1975) (rejecting challenge to State's ballistics expert: "the test bullets were offered in evidence and although the expert did not describe the details of individuals markings caused by imperfections in the gun's barrel, he did describe the class characteristics").

¶ 124　　　The court's observation in *O'Neal* regarding the ability of the defendant to conduct ballistics tests is particularly relevant in this case. The majority concludes that Jones was hampered in his defense by his inability to effectively cross-examine Barr. But this conclusion is refuted by the record. The State disclosed to defense counsel Barr's report (which is not included in the record) and the contents of his file, which, as Barr testified, included a photograph of the side-by-side comparison of the recovered and test-fired bullets. Defense counsel was permitted to interview Barr prior to trial. Also in advance of trial, counsel for Jones sought and was granted leave to have Jones's .380-caliber firearm, the recovered bullet and the test-fired bullets released to counsel and examined by an expert of counsel's choosing. At defense counsel's urging, the order granting the testing further provided that the identity of the "scientist"[5] and laboratory used to conduct the testing would remain confidential. The evidence reviewed by Barr was released to defense counsel on August 11, 2010, four months before trial.

¶ 125　　　When the evidence was returned to the State, defense counsel inadvertently included a copy of their expert's report, which the prosecutor promptly returned. Thus, Jones took advantage of the opportunity to have the evidence independently tested. We may also safely assume that the independent testing did not produce an expert opinion at variance with Barr's or a conclusion that there were no areas of agreement between the individual characteristics of the recovered and test-fired bullets or such evidence would naturally have been introduced at trial or, at a minimum, used in cross-examining Barr. And, in particular, we may assume that

---

[5]Ironically, defense counsel labeled the independent examiner a "scientist" while insisting that Barr be precluded from testifying to his opinion with any degree of "scientific certainty."

whatever independent examiner defense counsel chose did not conclude that there were an insufficient number of matching lines or scratch marks to reach the opinion that the bullet recovered from under the victim did not match the bullet fired from the weapon owned by Jones.

¶ 126     Barr was not "unable," as characterized by the majority, to articulate similarities between the recovered bullet and the test-fired bullets. The question the prosecutor asked Barr was whether he was able to determine the individual characteristics of the recovered bullet after he received it. But the only way a firearms examiner can reach a conclusion about the presence of similar characteristics–class or individual–is by comparing a recovered bullet to a test-fired bullet, a process to which Barr had not yet testified. So Barr's response to the question–"Could you be a little more specific as to what you mean by that?"–did not indicate either a lack of understanding of the concept of individual characteristics or an inability to identify them in this case, but only that individual characteristics must be discussed in the context of comparison of bullets. As the State indicated at trial, if defense counsel believed the number of lines and scratch marks was relevant to Barr's opinion (which Barr disclaimed), he was free to cross-examine Barr on the topic and having the benefit of Barr's report and the contents of Barr's file disclosed in discovery as well as his own expert's report, defense counsel was not hampered in that effort. Defense counsel chose not to pursue this line of questioning with Barr, perhaps in realization of the fact that it would not help his client's case. Further, nothing prevented defense counsel from using photographs of the evidence to illustrate his cross-examination and, in fact, as noted above, Barr testified that a photograph of the side-by-side comparison of the bullets was included in his file produced in pretrial discovery. While the majority concludes that the "better practice" would be for the prosecution to utilize photographs during an expert's direct examination, no authority is cited for the proposition that absent such demonstrative evidence, the expert's opinion lacks an adequate foundation.

¶ 127     Like the majority, I do not agree with the State that Jones "benefitted" from the lack of detail in Barr's testimony. Obviously, Jones would have been better off had Barr not testified at all. But the decision of both the State and the defense to refrain from eliciting further detail regarding the "sufficient areas of agreement" did allow defense counsel to argue at length to the jury that they should reject Barr's subjective opinion:

> "It is up to you to accept [Barr's] opinion or to reject that opinion. That is your decision. Consider as you heard from Justin Barr that it is his personal opinion. It is his subjective opinion. He said he found sufficient areas of agreement between a test fired bullet that he fired in Joe's gun and the bullet found underneath Ivory's body at the medical examiner's office.
>
> Did he ever tell you what those sufficient areas of agreement were? What does that mean, sufficient areas of agreement? What does agreement mean, a lot of areas?
>
> He told you he took a photograph, and he marked on the photograph. Did you see that photograph? Was it introduced into evidence?
>
> What did he tell you about what guided his personal subjective opinion? There aren't any national standards to guide his opinion. His own laboratory doesn't even have standards to guide his opinion. It is just his opinion.
>
> The prosecutor says that's science. He did tell you about a verification process, but you know, he reaches his opinion first and then the verification process is the buddy system. He goes to a coworker and says this matches. Do you agree with me?

Do you agree with your coworker who you work beside? And you know what, I verify your opinions too. You decide the facts.

* * *

Now, if you have a reasonable doubt about Justin Barr's opinion that the bullet from Ivory's body was fired in Joe's gun, if you have a reasonable doubt as to that, then the State hasn't proved [that defendant performed the acts which caused the death of Ivory Anderson]. You go no farther. That is it.

If they don't prove that to you based on that opinion, Joe Jones is not guilty."

Defense counsel, having been provided access to all the details he claims were missing from Barr's testimony, made the most of the absence of those details in his arguments to the jury. Far from being hampered in mounting his defense, counsel skillfully used the nonspecific standard accepted in the field of firearms identification–sufficient areas of agreement–to his client's advantage.

¶ 128    Jones's argument regarding the sufficiency of the evidence fails. The evidence in this case was actually much stronger than described by the majority. Jones was the last person seen with Anderson alive, minutes before his murder. When Anderson was shot by robbers (according to Jones's account to police in a videotaped interview that was played for the jury), Jones ran from the scene to his mother's house instead of staying to help police find the person who shot his friend. Immediately after the shooting, Jones ran by his girlfriend, told her "your friend has been shot" and kept running in the opposite direction. According to other witnesses, when Jones returned to the area later that evening, he had changed jackets, was "jittery" and did not talk about Anderson's murder. Jones went to visit Anderson's family two days after the shooting and Anderson's family called the police because they, according to Jones, thought he had something to do with the murder. It was only after he was in police custody that Jones told them about the supposed robbery. Jones also told police that if they did an autopsy, they would find .38- or .357- , not .380-caliber bullets in Anderson's body, claiming that in the dark and in the pouring rain he had been able to see the weapon fired by the robber. Jones repeatedly denied to police that he was in possession of a gun on the day Anderson was murdered or that he even owned a gun, yet (i) a .380-semiautomatic weapon was recovered from his home and (ii) he told other witnesses and contended at trial that when Anderson was robbed, he took out his gun and acted in the justifiable defense of others by firing at the perpetrators. After he was in custody, Jones told another acquaintance, also in custody, that he took money from Anderson after he was shot. All of this evidence was properly considered by the jury and is sufficient to support Jones's conviction.

¶ 129    Further, unlike the jury in *Safford*, it is not apparent that the jury in this case had any difficulty accepting Barr's opinion. See *Safford*, 392 Ill. App. 3d at 232 (Wolfson, J., dissenting) ("In this case it was made clear to the jury it was being asked to accept an opinion that was short of supporting details. Cross-examination on the point was vigorous. Obviously, that factual deficiency troubled the jury because it asked for a magnifying glass and had difficulty reaching a verdict. Still, this was a matter for the jury to decide and that is what it did."). Here the record does not reflect any similar hesitance by the trier of fact.

¶ 130    I also agree that by specifically requesting that a second degree murder instruction not be given, Jones has forfeited any claim of error premised on the court's failure to give that instruction.

¶ 131       Consequently, I can find no valid basis upon which to reverse Jones' conviction. Despite the lack of detail in Barr's opinion, the jury evidently considered it, together with the other evidence presented at trial, as sufficient to convict Jones of first degree murder. Given the ample opportunity provided to defense counsel to challenge the basis for Barr's opinion, there was no unfairness in allowing that opinion to be considered by the jury. Because, based on defense counsel's arguments, the jury was undoubtedly aware of the lack of detail in Barr's testimony, we are simply second guessing the trier of fact when we reverse. See *People v. Cooper*, 194 Ill. 2d 419, 431 (2000) (under appropriate standard of review, "a reviewing court will not substitute its judgment for that of the trier of fact on issues of the weight of evidence or the credibility of witnesses"). For these reasons and those articulated by Justice Wolfson in his dissent in *Safford*, 392 Ill. App. 3d at 231 (Wolfson, J., dissenting) ("I find no authority that supports the proposition that the lack of detail we find here is devastating enough to bar a qualified and experienced fingerprint examiner's opinions."), I respectfully dissent.